STATE OF NORTH CAROLINA v. BILLY KEVIN MOORE

No. 616A86

(Filed 3 February 1988)

1. **Constitutional Law § 31; Criminal Law § 75.4— motion for court appointed psychiatrist—confession by retarded defendant—denial of motion for psychiatrist erroneous**

    The trial court erred in a prosecution for first degree sexual offense, first degree burglary, and assault with a deadly weapon with intent to kill inflicting serious injury by denying defendant's motion for a court appointed psychiatrist where defendant submitted detailed evidence of his suggestive nature, the potentially coercive environment in which he made his statement, and the pivotal nature of his confession in the State's case. The evidence was sufficient to show that defendant had a particularized need for the assistance of a psychiatrist in the preparation of his defense.

2. **Constitutional Law § 31— denial of court appointed psychiatrist—appointment of psychiatrist to determine competency—not sufficient**

    The appointment of a psychiatrist to determine defendant's competency to stand trial did not in effect provide defendant with the assistance of a psychiatrist for the purpose of assisting in his defense and did not satisfy the State's constitutional obligation.

State v. Moore

3. **Constitutional Law § 31; Criminal Law § 75.4— denial of State appointed psychiatrist—confession by retarded defendant—showing of material assistance at trial**

The trial court erred in a prosecution for first degree sexual offense, burglary, and assault with a deadly weapon with intent to kill inflicting serious injury by denying defendant's motion for a court appointed psychiatrist where defendant showed that the appointment of an independent psychiatrist would have been of material assistance to him at trial even though the voluntariness of his confession was litigated at a hearing on his motion to suppress. Although the confession was admissible, defendant retained the right to introduce evidence relevant to its weight or credibility, and a psychiatrist might have assisted defendant by facilitating the preparation and presentation of a renewed motion to suppress on the grounds that he did not knowingly and intelligently waive his constitutional rights in that the retarded defendant's affirmative responses to a detective's questions were more the product of fear and a desire to please than an intelligent weighing of the choices before him.

4. **Constitutional Law § 31; Criminal Law § 60— denial of appointment of fingerprint expert—erroneous**

The trial court in a prosecution for first degree sexual offense, burglary, and assault erred by denying defendant's motion for a fingerprint expert where defendant made the requisite threshold showing of specific necessity by showing that absent a fingerprint expert he would be unable to assess adequately the State's expert's conclusion that defendant's palm print was found at the scene of the attack; defendant demonstrated that, because the victim could not identify her assailant, this testimony was crucial to the State's ability to identify defendant as the perpetrator of the crimes; and defendant showed that, due to his mental retardation, he had extremely limited communication and reasoning abilities and thus could provide defense counsel with little assistance in making a defense. A showing of a specific basis for questioning the accuracy of the State's determination that the print found at the scene of the offense matched a print taken from defendant was not required.

Justice MITCHELL concurring in the result.

Justice MEYER joins in the concurring opinion.

APPEAL by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence entered by *Burroughs, J.,* at the 23 June 1986 Criminal Session of Superior Court, GASTON County, upon defendant's conviction of first degree sexual offense. We allowed defendant's motion to bypass the Court of Appeals for review of his convictions for first degree burglary and assault with a deadly weapon with intent to kill inflicting serious injury for which lesser sentences were imposed. Heard in the Supreme Court on 14 October 1987.

*Lacy H. Thornburg, Attorney General, by Norma S. Harrell, Assistant Attorney General, and Elizabeth G. McCrodden, Associate Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

The questions presented by this appeal are whether the hearing courts erred when they denied defendant's pre-trial motions for the appointment of a psychiatrist and fingerprint expert to assist in the preparation and presentation of his defense. We hold that the hearing courts erred with regard to both motions and order a new trial on this account.

I.

On 7 January 1986, the Gaston County grand jury returned indictments charging defendant with first degree sexual offense, first degree burglary, and assault with a deadly weapon with intent to kill inflicting serious injury. All of the charges arose out of an assault on G. G.[1]

On 19 February 1986, defendant filed a motion to suppress a statement in which he confessed to assaulting G. G. On 4 March 1986 defendant filed a motion requesting the appointment of experts to facilitate the preparation and presentation of his defense. Defendant requested the appointment of a psychiatrist to assist him in preparing for the hearing on his motion to suppress. Defendant also requested the appointment of a fingerprint expert to evaluate the state's claim that defendant's palm print was found at the scene of the assault.

Defendant's motion for the appointment of expert witnesses was heard initially at the 10 March 1986 Criminal Session of Superior Court, Gaston County, Judge Claude S. Sitton presiding. The hearing court denied the motion. Defendant renewed his motion for the appointment of a psychiatrist on 20 June 1986. This renewed motion was heard and denied at the 23 June 1986 Crimi-

---

1. Throughout this opinion the victim and those in her family will be referred to by their initials in order to protect their identities.

nal Session of Superior Court, Judge Robert M. Burroughs presiding.

Defendant's motion to suppress his confession was heard and denied at the 2 June 1986 Criminal Session of Superior Court, Gaston County, Judge Robert M. Burroughs presiding.

At trial, the state's evidence tended to show that late in the evening on 12 October 1985 G. G. was surprised by an intruder when she went out on her back porch to put laundry in the washing machine. The intruder, a white male, struck G. G. on the face, and she fell to the floor semiconscious. Because of her semiconscious state, G. G. could not identify her assailant. She was aware, however, that he "had his hands in [her] vagina."

Neighbors of G. G. testified that they saw defendant walking up and down the street in front of her home at a time near the attack. Based on information from these neighbors, T. G., the victim's husband, sought and found defendant on the afternoon after the attack. He turned defendant over to the police.

Detective Fred Crawford of the Gastonia City Police questioned defendant on two occasions regarding the attack on G. G. On the first occasion defendant denied entering G. G.'s porch and attacking her. The second time Crawford questioned defendant, defendant confessed to beating G. G. with an object, pulling off her panties, and placing his fingers in her vagina.

Gastonia City Policeman R. L. Williams testified concerning his investigation at the scene of the assault. He lifted a partial palm print from a can of dog food found on the back porch. According to Williams, the print matched a palm print of defendant.

Defendant's evidence tended to show that defendant is mentally retarded and that due to his mental retardation he could not understand the implications of his pretrial statement. Dr. Kehlil S. Tanas, a forensic psychiatrist at Dorothea Dix Hospital, testified that defendant had a second or third grade vocabulary and would be "easily suggestible" by people in positions of authority over him. Defendant's family members and friends testified to defendant's limited intellectual ability and passive nature. They also declared defendant was easily led and wanted to please others.

Ruth Moore, defendant's stepmother, and Ray Moore, defendant's stepbrother, testified that they saw defendant the evening G. G. was attacked, as well as the morning after. On both occasions defendant was wearing a white t-shirt and dark blue pants. According to these witnesses, defendant's clothing showed no bloodstains the morning after G. G. was assaulted.

## II.

[1] Defendant contends that the court committed reversible error when it denied his renewed motion for the appointment of a psychiatrist to assist in the preparation of his defense. We agree.

Before denying defendant's renewed motion for the appointment of a psychiatrist, Judge Burroughs had conducted an extensive hearing on defendant's earlier motion to suppress his confession. At this hearing Gastonia Police Department Detective Fred Crawford recounted the two occasions on which he questioned defendant. The first was on the afternoon after the assault on G. G., 12 October 1986, when defendant admitted to being in G. G.'s neighborhood on the evening of the assault, but denied entering her home or attacking her. Detective Crawford declared that he advised defendant of his rights by reading from a standard form containing *Miranda* warnings and a waiver of *Miranda* rights. The defendant signed the form and agreed to have his photograph taken. Detective Crawford took defendant home.

Detective Crawford next questioned defendant on 15 October 1986. He went to defendant's residence and, pursuant to a warrant, arrested him for the first degree rape of G. G. Detective Crawford took defendant to the police station and reminded him of his rights by reading from the same standard form used three days previously. The colloquy between Detective Crawford and defendant, which was read in its entirety at the suppression hearing, went as follows:

Detective Crawford: Mr. Moore, we previously went over your rights and I would like to go over them with you again. Answer yes or no if you understand. You understand that you have a right to remain silent?

Defendant: Yes, sir.

Detective Crawford: Anything you say can and will be used against you in court?

Defendant: Yes.

Detective Crawford: You have a right to talk to a lawyer for advice before I ask you any questions and have him with you during questioning?

Defendant: Yes.

Detective Crawford: If you cannot afford a lawyer, one will be appointed before any questioning if you wish?

Defendant: Yes, sir.

Detective Crawford: If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering any time until you talk to a lawyer.

Defendant: Yes.

Detective Crawford: Do you understand each of these rights that I have just explained to you?

Defendant: Yes, sir.

Detective Crawford: Do you each of these rights that I have just explained to you? (sic)

Defendant: Yes, sir.

Detective Crawford: Mr. Moore, you previously stated that you cannot read. I have got to read this paragraph and I am going to read it for you. (sic) If you understand that, answer yes. The paragraph states: "I have read a statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand what I am doing. No promises or threats have been made to me. No pressure or coercion of any kind has been used against me." Do you understand this paragraph?

Defendant: Yes.

Detective Crawford: Okay, with that paragraph in mind, are you still willing to talk to me and answer questions I might ask you, knowing that you have the right to have a lawyer with you?

Defendant: Yes.

Detective Crawford: Are you willing to talk with me without a lawyer present at this time knowing full well you have the right to have one at this time?

Defendant: Yes.

Detective Crawford: Is this your signature there?

Defendant: Yes.

Defendant then made a statement in which he admitted assaulting G. G. on her back porch.

On cross-examination Detective Crawford acknowledged that he never explained the meaning of any of the words in the standard forms he read to defendant. Specifically, Detective Crawford did not explain the meaning of "coercion," and "pressure." Also, Detective Crawford did not inform the defendant about how to obtain the assistance of a court appointed lawyer.

At the conclusion of the state's evidence, the court asked Detective Crawford a series of questions concerning whether defendant appeared confused or incoherent, whether he ever asked for an explanation of his rights, and whether his answers were reasonable in light of the questions Detective Crawford asked. Detective Crawford testified that defendant did not appear confused or incoherent, that he never asked for an explanation, and that his answers were reasonable.

Defendant presented evidence from Dr. Tanas, a forensic psychiatrist who had examined defendant at Dorothea Dix Hospital for the sole purpose of determining whether defendant was competent to stand trial. Dr. Tanas testified that he had tested defendant and determined that defendant had an intelligence quotient ("IQ") of fifty-one, defendant's "mental age" was eight or nine years, and defendant had the vocabulary of an average fourth or fifth grader. Dr. Tanas declared that he did not believe defendant could understand the meaning of the word "coercion." He added that "with his sub-average intelligence and functions [defendant] would be easily led and easily influenced." Tanas testified that he believed defendant capable of proceeding to trial.

Defendant testified in his own behalf. He declared that on the morning of 12 October 1986 T. G., the husband of the victim, and two other men came to the site where defendant was working. T. G. asked defendant to accompany them to the G. home. En route, T. G. told defendant about the attack on his wife. When they arrived, T. G. showed defendant the scene of the assault. Defendant testified that he tried to leave, but that T. G. told him to stay until the police arrived. The police arrived, handcuffed defendant, and took him to the police station.

Concerning the occasions when Detective Crawford questioned him, defendant stated that he did not understand the questions. Defendant declared that he answered "yes" to all of Detective Crawford's questions because he wanted to get the interview over with as quickly as possible. According to defendant, Detective Crawford had told him that he did not believe defendant's denials of involvement, and that if defendant told the "truth" Detective Crawford would see what could be done for the defendant. Defendant testified that although he had previously been represented by a lawyer he did not understand how to acquire appointed counsel. On the previous occasions, defendant's mother arranged for counsel. Defendant stated that he did not understand the meaning of the word "appoint."

Defendant's mother, Betty Moore, and stepmother, Ruth Moore, both testified that they did not believe defendant could understand the *Miranda* rights as recited to him by Detective Crawford. Both witnesses said that unless Detective Crawford explained the *Miranda* rights, defendant would not have understood them. Defendant's stepbrother, Charles Ray Moore, testified to the same effect.

Karen Whitlaw, a friend of the defendant's, testified that the defendant could be intimidated easily. According to Ms. Whitlaw, "anybody can just, you know, run over Kevin."

At the conclusion of the hearing, the court denied the motion to suppress. The court made findings of fact and conclusions of law to the effect that defendant knowingly and intelligently waived his rights. The court also concluded that defendant made his confession voluntarily.

Subsequent to the denial of his motion to suppress, defendant renewed his motion for funds to hire an independent psychiatrist. In support of this motion defendant maintained that expert assistance was necessary in order to enable him to defend at trial on the ground that, under all the circumstances, his confession was not to be believed. Defendant contended that, in light of the paucity of evidence linking him to the assault on G. G., the validity of his confession was likely to be one of the most important issues at trial. Defendant pointed out that Dr. Tanas, the forensic psychiatrist appointed to assess defendant's competence to stand trial, did not assist him in preparing the defense that his confession was not believable.

The court denied defendant's renewed motion. The court made no findings of fact or conclusions of law when it denied this motion.

We hold under *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985), and our cases decided under *Ake*, that the hearing court erred in denying defendant's renewed motion for a court appointed psychiatrist to assist in the preparation of his defense.

In *Ake* the Supreme Court held that when a defendant makes a preliminary showing that his sanity will likely be a "significant factor at trial," the defendant is entitled, under the Constitution, to the assistance of a psychiatrist in preparation of his defense. *Id.* at 74, 84 L.Ed. 2d at 60. We have applied the holding in *Ake* to instances when an indigent defendant moved for the assistance of experts other than psychiatrists, holding that such experts need not be provided unless the defendant "makes a threshold showing of specific necessity for the assistance of the expert" requested. *State v. Penley*, 318 N.C. 30, 51, 347 S.E. 2d 783, 795 (1986) (pathologist). *See State v. Hickey*, 317 N.C. 457, 468, 346 S.E. 2d 646, 654 (1986) (investigator); *State v. Johnson*, 317 N.C. 193, 199, 344 S.E. 2d 775, 779 (1986) (medical expert).

In order to make a threshold showing of specific need for the expert sought, the defendant must demonstrate that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case. *State v. Johnson*, 317 N.C. at 198, 344 S.E. 2d at 778. This test was developed originally under N.C.G.S. § 7A-450(b), which provides that the state must furnish

an indigent defendant "with counsel and the other necessary expenses of representation." Subsequent to the Supreme Court's *Ake* decision, we reaffirmed this standard as that which the defendant must meet in order to assert a constitutional right to the assistance of experts. *State v. Johnson*, 317 N.C. at 199, 344 S.E. 2d 775 at 778; *State v. Massey*, 316 N.C. 558, 566, 342 S.E. 2d 811, 816 (1986). In determining whether the defendant has made the requisite showing of his particularized need for the requested expert, the court "should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made." *State v. Gambrell*, 318 N.C. 249, 256, 347 S.E. 2d 390, 394 (1986).

The issue in the present case is whether, under all the circumstances known to the hearing court at the time defendant made his renewed motion for a court appointed psychiatrist, defendant demonstrated a specific need for the assistance of a psychiatric expert. *Id.* We hold defendant demonstrated such a need.

At the time defendant renewed his motion for a psychiatric expert the court had conducted an extensive hearing on defendant's motion to suppress in which defendant showed, *inter alia,* that:

(1) Defendant has an IQ of 51;

(2) Defendant's "mental age" is equivalent to that of an eight or nine year old;

(3) Defendant's vocabulary is equivalent to that of a fourth or fifth grade elementary student;

(4) According to expert testimony, defendant cannot understand complicated instructions;

(5) According to family members, defendant could not understand the rights read by Detective Crawford without further explanation;

(6) According to the expert testimony, defendant is easily led and intimidated by others;

(7) According to a friend of defendant, defendant can be "run over" by "anybody";

(8) Defendant's low intelligence level may have rendered him unable to understand the nature of any statement he may have made;

(9) Defendant's mental retardation may have rendered him unable to knowingly waive his rights;

(10) The state's case against defendant was predicated in significant measure on defendant's confession because G. G. could not identify her assailant.

We conclude, as defendant argues, that this evidence suffices to show that defendant had a particularized need for the assistance of a psychiatrist in the preparation of his defense.

Defendant showed that the credibility of his confession was pivotal in the state's case against him. Since G. G. could not identify her assailant, the central issue before the jury was the perpetrator's identity. Aside from defendant's confession, and the palm print found at the scene of the assault which allegedly matched a palm print of defendant's, the state had little evidence linking defendant to the crimes in question. Thus, the state's case rested, heavily, on the jury's acceptance of defendant's confession as true.

Defendant also demonstrated that his confession was of questionable credibility. Defendant showed that he has an IQ of 51. This places him at the lowest level of mild mental retardation. Through the detailed testimony of a forensic psychiatrist, defendant demonstrated that he is "easily led and easily influenced" by those exercising authority. Family and friends testified to the same effect. Through these same witnesses defendant demonstrated he is unable to understand subjects with the least degree of complication, thus indicating that defendant very well may not have grasped the implications of what he was saying in his inculpatory statement.

Having demonstrated the centrality of his confession to the state's case, and having cast doubts on its credibility, we conclude defendant made the requisite threshold showing of his need for the assistance of a psychiatrist in the preparation and presentation of his defense.

The state contends this case is indistinguishable from *Massey*, in which this Court concluded that the trial court did not err

when it denied the request of a mentally retarded defendant for the appointment of a psychiatrist. *State v. Massey*, 316 N.C. at 566, 342 S.E. 2d at 816. We disagree. *Massey* is similar to the instant case in that a mentally retarded defendant was convicted of a felony based largely on a confession. *Id.* at 562, 342 S.E. 2d at 813. As in the present case, defendant moved to have a psychiatrist appointed to assist him in preparing his defense. His motion was denied. *Id. Massey* differs from the present case in that the defendant in *Massey* failed to make a sufficiently specific demonstration of his need for the assistance of a psychiatrist. In *Massey* defendant did not specify the precise degree of his retardation, neither did he put on any evidence indicating the effect his particular mental condition might have had on his ability to understand either his rights or the implications of his statement. *Id.* at 566, 342 S.E. 2d at 816. In support of his motion for funds to hire a psychiatrist to assist in the presentation of his case, the defendant in *Massey* relied solely on a single psychological evaluation which indicated that he was mildly mentally retarded. Because the defendant in *Massey* made only the bald assertion that because of his mild mental retardation he needed the assistance of a psychiatrist, we held that he did not demonstrate the requisite threshold showing of specific need. *Id.*

The instant case stands in contrast to *Massey*. Here defendant submitted detailed evidence of his suggestible nature, the potentially coercive environment in which he made his statement, and the pivotal nature of his confession in the state's case. We believe that in making this showing, defendant demonstrated a particularized need for the assistance of a psychiatrist in the preparation of his defense.

[2] The state also argues that defendant was, in effect, provided with the assistance of a psychiatrist in the person of Dr. Tanas, the forensic psychiatrist who examined defendant in order to determine his competency to stand trial. The state notes that defendant called Dr. Tanas to testify at the hearing on defendant's motion to suppress, as well as at trial, and suggests that further assistance by a psychiatrist could have added little in the way of assisting defendant.

This argument stands at odds with our recent *Gambrell* decision. In *Gambrell* we addressed this argument and declared that

"what is required, as *Ake* makes clear, is that defendant be furnished with a competent psychiatrist for the purpose of not only examining defendant but also assisting defendant in evaluating, preparing, and presenting his defense. . . ." *State v. Gambrell*, 318 N.C. at 259, 347 S.E. 2d at 395. In this case, Dr. Tanas was not appointed for the purpose of assisting defendant in preparation of his defense. He was appointed solely for the purpose of assessing defendant's competency to stand trial. Therefore, Dr. Tanas' involvement with defendant did not satisfy the state's constitutional obligation. *Id.*

[3] Finally, the state maintains defendant has failed to show that the appointment of an independent psychiatrist would have been of material assistance to him at trial. The state argues that the voluntariness of defendant's confession was fully litigated at the hearing on defendant's motion to suppress, and that the appointment of a psychiatrist would not have enabled defendant to make his case any stronger at trial. The state notes especially that after an extensive hearing on defendant's motion to suppress, the hearing court concluded that defendant waived his rights knowingly and intelligently, and that his confession was voluntarily made.

This argument fails to recognize the many ways a psychiatrist might have aided defendant in preparing and presenting his defense that, under all the circumstances surrounding his confession, the statement was not to be believed. Although the hearing court ruled that defendant's statement was admissible, defendant retained the right "to introduce before the jury evidence relevant to [the statement's] weight or credibility." N.C.G.S. 8C-1 Rule 104(e). "Admissibility is for determination by the judge unassisted by the jury. Credibility and weight are for determination by the jury unassisted by the judge." *State v. Walker*, 266 N.C. 269, 273, 145 S.E. 2d 833, 836 (1966). A psychiatrist, unlike lay witnesses, could have gathered and analyzed pertinent information about the nature of defendant's confession, and drawn plausible conclusions about its trustworthiness.[2] A psychiatrist also could have im-

2. In *Ake* the Court made a similar point concerning the manner a psychiatrist can facilitate the preparation and presentation of an insanity defense. The Court declared that when a "defendant's mental condition is relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." *Ake*, 470 U.S.

pressed upon the jury the frequent plight of the mentally retarded when they become embroiled in a criminal prosecution. It has long been recognized that

> [t]he retarded are particularly vulnerable to an atmosphere of threats and coercion, as well as to one of friendliness designed to induce confidence and cooperation. A retarded person may be hard put to distinguish between the fact and the appearance of friendliness. If his life has been molded into a pattern of submissiveness, he will be less able than the average person to withstand normal police pressures. Indeed they may impinge on him with greater force because their lack of clarity to him, like all unknowns, renders them more frightening. Some of the retarded are characterized by a desire to please authority: if a confession will please, it may be gladly given. 'Cheating to lose,' allowing others to place blame on him so that they will not be angry with him, is a common pattern among the submissive retarded. It is unlikely that a retarded person will see the implications or consequences of his statements in the way a person of normal intelligence will.

President's Panel on Mental Retardation, Report of the Task Force on Law 33 (1963). *See also* Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 451-52 (1985).

Another way in which a psychiatrist might have assisted defendant at trial was by facilitating the preparation and presentation of a renewed motion to suppress defendant's confession on the grounds that he did not knowingly and intelligently waive his

---

at 80, 84 L.Ed. 2d at 64. The Court concluded that through the "process of investigation, interpretation and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense." *Id.*

The Court's analysis is applicable to the cases where the issue concerns the credibility of a confession made by a mentally retarded defendant. The resolution of this issue is equally critical to the outcome of the case. The presentation of the defense that the defendant, due to his mental retardation, confessed to crimes he did not commit, is sufficiently complex to necessitate the assistance of experts.

constitutional rights.[3] Although the hearing court found the confession was made knowingly and intelligently, it did so without the benefit of expert opinion addressing these issues. A psychiatrist appointed to assist defendant presenting his defense could have brought to the trial court's attention the particular problems attending the waiver of rights by a mentally retarded defendant.

In *State v. Spence*, 36 N.C. App. 627, 244 S.E. 2d 442 (1978), the testimony of psychiatrists played a pivotal role in the Court of Appeals' determination that the mentally retarded defendant might not have waived his rights knowingly and intelligently. In *Spence* the defendant was a twenty-year-old mentally retarded male who possessed the general understanding of a child of six to eight years of age. The defendant, through the assistance of expert testimony by psychiatrists, demonstrated that he had difficulty understanding his rights as read to him, and that he did not grasp the consequences of waiving these rights. The psychiatrists also testified that the defendant had an eagerness to please the police. The court declared that these facts tended to indicate "that defendant might have been inclined to state that he understood even when he did not. . . ." The court went on to hold that, under these circumstances, the state did not carry its burden of proving that the defendant waived his rights knowingly and intelligently. *Id.* at 629, 244 S.E. 2d at 441-42.

Reliable research supports the evidence offered by defendant at the suppression hearing concerning his limited ability to under-

---

3. It seems clear from defendant's renewed motion for the appointment of a psychiatrist that defendant contemplated making a second motion to suppress on these grounds if the expert assistance was provided. His verified motion reads:

> The defendant continues to contend that [an independent psychiatrist] is essential to the preparation and conducting of his defense. In support of this Motion, the defendant shows unto the Court the following:

> 5. That Dr. Tannas (sic) never addressed the issue of the ability of the defendant to understand the Constitutional Rights to which he was entitled and therefore to freely and voluntarily waive said rights;

> WHEREFORE, the defendant prays for an Order providing him with funds with which to hire an independent psychiatrist to examine him and to make a specific determination and examination of his ability to understand the Constitutional rights to which he is entitled, whether or not the defendant could freely and voluntarily waive those rights under all the circumstances present in these case. . . . (sic)

stand the explanation of his rights, and it demonstrates why expert assistance might have been helpful on this aspect of the case. It reveals that even when a mentally retarded suspect's responses appear normal, his answers may not be reliable. *See* Rosen, Floor & Zisfein, *Investigating the Phenomenon of Acquiescence in the Mentally Handicapped: 1 Theoretical Model, Test Development and Normative Data,* 20 Britt J. Mental Subnormality, 58, 68 (1974); *see generally* Sigdman, Budd, Stankel & Schoenrock, *When in Doubt, Say Yes: Acquiescence in Interviews with Mentally Retarded Persons,* 19 Mental Retardation 53 (1980). "[M]any people with mental retardation are predisposed to 'biased responding' or answering in the affirmative questions regarding behaviors they believe are desirable, and answering in the negative questions concerning behaviors they believe are prohibited. The form of a question can also directly affect the likelihood of receiving a biased response. . . ." Ellis & Luckasson, *Mentally Retarded Criminal Defendants,* 53 Geo. Wash. L. Rev. 414, 428 (1985).

Responses by the mentally retarded to "yes-no" questions posed by persons in authority present special problems. According to one study, the danger of response bias in this situation is so great that questioners should abandon altogether the use of "yes-no" questioning techniques. Budd, Sigelman & Sigelman, *Exploring the Outer Limits of Response Bias,* 14 Sociological Focus 297, 305-06. *See* Ellis & Luckasson, *Mentally Retarded Criminal Defendants,* 53 Geo. Wash. L. Rev. 414, 428, n.72 (1985).

In the instant case, defendant waived his rights pursuant to a series of "yes-no" questions by Detective Crawford. According to Detective Crawford, defendant did not appear confused, and his answers were reasonable in light of the questions asked him. Largely on this basis, the hearing court concluded that defendant waived his rights knowingly and voluntarily. A psychiatrist, assisting defendant in presenting his defense, would have enabled the trial court to assess more fully and accurately the validity of defendant's responses. He would have been able to alert the court to the possibility that defendant's affirmative responses to Detective Crawford's questions were more the product of fear and a desire to please than an intelligent weighing of the choices before him. *See* Rosen, Floor & Zisfein, *Investigating the Phenomenon of Acquiescence in the Mentally Handicapped: 1 Theoretical Model,*

*Test Development and Normative Data*, 20 Britt J. Mental Subnormality, 58, 68 (1974).

We do not agree with the state, therefore, that a psychiatrist would not have been able to provide material assistance to defendant in the preparation and presentation of his defense. We hold that the trial court erred when it denied defendant's renewed motion for the appointment of a psychiatrist.

### III.

**[4]** Defendant next contends the hearing court erred in denying his pre-trial motion for a fingerprint expert. We agree.

In support of his motion defendant made the following verified allegations:

(1) The state's witness cannot identify the perpetrator of the crimes.

(2) What purports to be a palm print of the defendant was identified by an identification officer for the Gastonia City Police Department on an item found at the scene of the assault.

(3) The officers charged with responsibility for investigating this case are co-workers of the identification officer.

(4) The state's palm print evidence is critical to the state's case.

(5) Defense counsel lacks the ability to assess the accuracy of the palm print evidence.

Defendant's motion for the appointment of experts, both fingerprint and psychiatric, was heard at the 10 March 1986 Criminal Session of Superior Court, Gaston County, Judge Claude S. Sitton presiding. The court heard arguments concerning defendant's need for the appointment of a psychiatrist to assist in the preparation of defendant's motion to suppress. Defense counsel pointed out that defendant has limited capacity to understand and reason due to his mental retardation. After making this showing, defense counsel relied on the verified allegations in his motion to support his request for the appointment of a fingerprint expert. The state declined the opportunity to respond. The court denied the motion.

At trial, the state presented expert testimony from Gastonia police officer R. L. Williams that a "partial palm print" found on a can of dog food at the crime scene matched defendant's palm print. Defendant presented no expert witness to respond to Williams' conclusion.

The question of whether defendant should have been provided with the assistance of a fingerprint expert is controlled by *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53, and our cases decided under *Ake*. As noted already, *Ake* requires "an *ex parte* threshold showing" that the matter subject to expert testimony is "likely to be a significant factor" in the defense. *Id.* at 82, 84 L.Ed. 2d at 60. Our cases require that an indigent defendant prove that the assistance of an expert would materially assist him in the preparation of his defense, or that the denial of this assistance would deprive him of a fair trial. *State v. Penley*, 318 N.C. at 52, 347 S.E. 2d at 795; *State v. Johnson*, 317 N.C. at 199, 344 S.E. 2d at 778; *State v. Massey*, 316 N.C. at 566, 342 S.E. 2d at 816.

The showing demanded under *Ake* and our cases is a flexible one. It is designed to ensure that the indigent defendant "has access to the raw materials integral to the building of an effective defense." *Ake*, 470 U.S. at 77, 84 L.Ed. 2d at 62. The showing is necessarily flexible because the court's determination of whether a defendant has met his burden of demonstrating a specific need for such a "raw material" must be resolved on a case-by-case basis, according to the circumstances known to the trial court at the time the request is made. *State v. Gambrell*, 318 N.C. at 256, 347 S.E. 2d at 394.

We conclude defendant made the requisite threshold showing of specific necessity for a fingerprint expert. Defendant showed that absent a fingerprint expert he would be unable to assess adequately the state's expert's conclusion that defendant's palm print was found at the scene of the attack. Defendant also demonstrated that, because the victim could not identify her assailant, this testimony by the state's expert was crucial to the state's ability to identify defendant as the perpetrator of the crimes charged against him. Moreover, at the hearing on defendant's motion before Judge Sitton, defendant showed that, due to his mental retardation, he had extremely limited communication and

reasoning abilities, and thus could provide defense counsel with little assistance in making a defense. All of these circumstances taken together demonstrate that defendant would have been "materially assisted in the preparation of his defense" had the trial court granted his motion. *State v. Penley*, 318 N.C. at 52, 347 S.E. 2d at 796.

The state argues that defendant's showing did not rise to the level of specificity demanded by *Ake*, and our cases decided under *Ake*. It asserts that the presence of technical scientific evidence in the state's case does not necessarily mandate the appointment of a defense expert. We have no quarrel with this general assertion. The state goes on, however, and suggests that in order to show a "particularized need" for the assistance of a fingerprint expert defendant was required to present a specific basis for questioning the accuracy of the state's determination that the print found at the scene of the offense matched a print taken from defendant.

The showing suggested by the state is not required. To require as a condition precedent to acquiring an appointed fingerprint expert that the defendant discredit the state's expert testimony stands at odds with the general "threshold" showing of need required under our cases. The state's proposed test would demand that the defendant possess already the expertise of the witness sought. A review of our cases in which defendants requested the assistance of technical experts reveals that while the threshold showing of specific necessity for the appointment of such an expert is not a light burden, it is not so severe as to require that a defendant affirmatively discredit the state's expert witness before gaining access to his own.

In *Penley* we held the trial court did not err when it denied defendant's motion for the appointment of a pathologist to assist him in his defense. *State v. Penley*, 318 N.C. at 51-52, 347 S.E. 2d at 796. We did not require the defendant, in some fashion, to discredit already existing pathological reports. Instead, we required only what our post-*Ake* cases consistently call for: a threshold showing of specific necessity. *Id.* We found that "the defendant arguably made a threshold showing of a specific necessity" but went on to hold that this need was met through the autopsy reports already provided by independent experts. *Id.*

The present case differs from *Penley* in a number of significant ways. In *Penley* the report in question was prepared by an independent party. *Id.* at 52, 347 S.E. 2d at 796. Here, the assessment of the fingerprints was made solely by witnesses for the state. In *Penley* the defendant's guilt or innocence did not stand or fall with the testimony of the pathologist. Here, the only physical evidence placing defendant at the scene of the crime was a palm print which the state's expert declared matched defendant's.[4]

In *State v. Johnson* the defendant requested the assistance of a "medical expert" to assist in the preparation of his defense. 317 N.C. at 199, 344 S.E. 2d at 778. In his motion requesting a "medical expert" defendant merely asserted that an expert was needed to analyze all available information and, possibly, to testify on his behalf. We held that the defendant failed to set out sufficient facts evidencing a specific need for the requested expert. Similarly, in *State v. Hickey*, 317 N.C. at 467, 346 S.E. 2d at 653, the defendant requested the appointment of an investigator to investigate the state's key witness. Defendant did not declare why she needed to investigate the state's witness, but we assumed it was for the purpose of discovering facts that could be used to impeach the witness' testimony. *Id.* at 469, 346 S.E. 2d at 654. We held that the mere general desire to discover evidence which might be used for impeachment purposes did not satisfy the requirement that a defendant demonstrate a threshold showing of need. *Id.*

The differences between *Johnson, Hickey,* and the instant case are manifest. In both *Johnson* and *Hickey*, the defendants offered only "undeveloped assertions that the requested assistance

---

4. In *Ake* the Supreme Court expressed special concern for defendants whose guilt or innocence hinges on the testimony of the state's experts and who, because of their poverty, cannot afford experts of their own. The Court noted " '[t]estimony emanating from the depth and scope of specialized knowledge is very impressive to a jury. The same testimony from another source can have little effect.' " *Ake*, 470 U.S. at 81, n.7, 84 L.Ed. 2d at 65, n.7 (quoting F. Bailey & H. Rothblatt, *Investigation and Preparation of Criminal Cases* § 175 (1970) ). The Court went on to note that when, because of lack of funds, a defendant *is* unable *to rebut* expert testimony with expert assistance of his own, the defendant's chances of persuading the jury to reject the expert's conclusions are "devastated." *Id.* at 83, 84 L.Ed. 2d at 66. *See also Moore v. Kemp*, 809 F. 2d 702, 744 (11th Cir. 1987) (Johnson, J., dissenting).

would be helpful." *Caldwell v. Mississippi*, 472 U.S. 320, 323, n.1, 86 L.Ed. 2d 231, 236, n.1 (1985). In the present case, defendant demonstrated that the determination of his guilt or innocence would hinge largely on the unrebutted testimony of the state's fingerprint expert. Defendant requested a fingerprint expert not to engage in some amorphous fishing expedition, as in *Johnson* and *Hickey*, but to enable him, and ultimately perhaps the jury, to assess more accurately the one item of hard evidence implicating him in the crimes charged. Under these circumstances, denying defendant the assistance of a fingerprint expert denied him "an adequate opportunity to present his claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612, 41 L.Ed. 2d 341, 352 (1974).

Finally, we note this case also differs from *Penley, Johnson,* and *Hickey* in that, unlike the defendants in those cases, defendant showed his mental retardation diminished his capacity to assist his counsel in his own defense.

We reaffirm the holdings of our post-*Ake* decisions which require that indigent defendants meet the flexible requirement of a threshold showing of specific need for the expert sought. For the reasons herein stated, we hold defendant made such a showing in this case.

In summary, we hold that the hearing courts erred in denying defendant's renewed pretrial motion for the appointment of a psychiatrist and his pretrial motion for the appointment of a fingerprint expert. The result is a

New trial.

Justice MITCHELL concurring in result.

I concur in the view that the trial court erred in denying the defendant's motion for psychiatric assistance in the preparation of his defense. Therefore, I also concur in the holding that the defendant is entitled to a new trial.

I disagree, however, with the view that the trial court erred by denying the defendant's motion for the appointment of a fingerprint expert to assist him in the preparation of his defense. I believe the Court's decision on that issue will require appoint-

ment of fingerprint experts to assist defendants in almost all cases in which fingerprint evidence is introduced by the State. Certainly, it will require the appointment of fingerprint experts in all cases where the State relies upon fingerprint evidence and there were no eyewitnesses to the crime charged.

It is rather clear in this case that the defendant failed to carry his burden under N.C.G.S. § 7A-454 to show a reasonable likelihood that the appointment of a fingerprint expert would materially assist him in the preparation of his defense or that without such help he would not receive a fair trial. *See generally State v. Corbett*, 307 N.C. 169, 297 S.E. 2d 553 (1982). As a result, the Court rightly focuses its attention on the issue of whether the appointment of a fingerprint expert was required in this case under the holding of *Ake v. Oklahoma*, 470 U.S. 68, 84 L.Ed. 2d 53 (1985). *Ake* dealt with the requirement that a defendant be provided psychiatric assistance when his sanity was likely to be a significant factor in his defense. 470 U.S. at 82, 84 L.Ed. 2d at 60. Indeed, Ake's entire defense was insanity. The issue of sanity is one about which experts can and frequently do disagree, even though all experts in the field have received years of intensive and highly specialized and demanding training. It was easy in *Ake* for the Supreme Court to conclude that Ake could not properly prepare his defense without the assistance of an expert in the field of psychiatry.

The type of "expertise" involved in taking and analyzing fingerprints is a far cry from that employed by psychiatrists or many of the other expert witnesses who appear before courts. Indeed, this Court has held that fingerprints taken or "lifted" by a *non-expert* from the scene of a crime or from the defendant are admissible in evidence. *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975).

The taking and analysis of fingerprints is largely a mechanical function, although admittedly one which requires some training and experience. Basically, the analysis of fingerprints involves comparing the latent print taken from the scene of the crime with a known print of the defendant to determine whether there are points of similarity. Once a given number of points of similarity are observed, the expert draws the conclusion that the two prints were made by the same person.

It has been my experience that all of the steps involved in fingerprint analysis can be readily demonstrated to a jury in such a manner that the jurors are able to determine for themselves whether the points of similarity are in fact similar. Likewise, the jurors are as capable as the expert of counting the number of points of similarity. There simply is nothing so mysterious or difficult about fingerprint analysis and comparison as to prevent the ordinary lay juror from determining whether the procedure has been performed correctly and the expert has reached the right conclusion, once the technique is explained and pointed out to the juror. For this reason, a defendant can properly defend himself against such evidence—if in fact he will ever be able to defend himself—by the simple expedient of thorough cross-examination of the State's fingerprint witness. *See State v. Corbett*, 307 N.C. 169, 297 S.E. 2d 553.

In the present case, the victim was unable to identify the defendant. However, several neighbors saw the defendant near the victim's house at about the time the crime was committed. Also, the defendant confessed to the crime, and this confession was admitted at trial. Although it is possible that the confession might be rejected at the new trial to which we today decide the defendant is entitled, that fact situation is not before us in considering the trial court's ruling on the motion for a fingerprint expert. Given the facts of this case as it appeared before the trial court, I simply do not believe that the defendant presented any reason to believe that the veracity of the State's fingerprint evidence was "likely to be a significant factor" in his defense within the meaning of that phrase as used in *Ake*. *Cf. Caldwell v. Mississippi*, 472 U.S. 320, 323, n.1, 86 L.Ed. 2d 231, 236, n.1 (1985) (denial of fingerprint and ballistics experts not deprivation of due process where the defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial . . . .")

With the foregoing exception, I concur in the reasoning of the Court. I concur in the result reached.

Justice MEYER joins in this concurring opinion.