STATE OF NORTH CAROLINA v. JONATHAN PARKS

No. 202A91

(Filed 25 June 1992)

1. **Constitutional Law § 252 (NCI4th)— right to court-appointed psychiatrist—sufficiency of showing**

    The trial court erred in the denial of an indigent defendant's pretrial motion for appointment of a psychiatrist at state expense to assist in the preparation of his defense on numerous charges stemming from a three and one-half hour ordeal in which defendant held his half sister at gunpoint where defendant showed that he had previously been diagnosed as being schizophrenic; his current diagnosis by a psychiatrist at Dorothea Dix Hospital "suggested a longstanding and severe personality disorder," possibly accompanied with delusional beliefs; defendant's attorney informed the trial court that he would pursue an insanity defense if the court-appointed psychiatrist believed such a defense was viable; and the prosecutor clearly anticipated the possibility of an insanity defense in that she had already subpoenaed the Dix Hospital psychiatrist who examined defendant to determine his competency to stand trial.

    **Am Jur 2d, Criminal Law §§ 67, 70.**

    **Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19.**

2. **Constitutional Law § 252 (NCI4th)— right to court-appointed psychiatrist—lack of problems between arrest and motion not dispositive**

    While evidence of psychiatric problems during the interval between defendant's arrest and his motion for appointment of a psychiatrist may be considered by the trial court in determining whether to grant the motion, the lack of such evidence is not dispositive.

    **Am Jur 2d, Criminal Law §§ 67, 70.**

3. **Constitutional Law § 252 (NCI4th)— motion for court-appointed psychiatrist—examination by Dix Hospital psychiatrist not sufficient**

    The trial court erred in denying defendant's motion for a court-appointed psychiatrist on the ground that there was

STATE v. PARKS

[331 N.C. 649 (1992)]

no need to appoint a psychiatrist to assist defendant because a psychiatrist from Dorothea Dix Hospital had already examined defendant and his conclusions were somewhat favorable to defendant, since the only role of the Dix Hospital psychiatrist was to determine if defendant was competent to stand trial, and his involvement did not fulfill the state's constitutional obligation to defendant.

Am Jur 2d, Criminal Law §§ 67, 70.

APPEAL by defendant as of right pursuant to N.C.G.S. § 7A-30(1) from an unpublished opinion of the Court of Appeals, 102 N.C. App. 354, 402 S.E.2d 662 (1991), finding no error in defendant's convictions of felonious breaking and entering, second-degree kidnapping, larceny of a firearm, robbery with a dangerous weapon, and carrying a concealed weapon, before *Downs, J.*, at the 29 August 1988 Session of Superior Court, GRAHAM County. Heard in the Supreme Court 10 March 1992.

*Lacy H. Thornburg, Attorney General, by Howard E. Hill, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

FRYE, Justice.

The sole issue on appeal is whether the Court of Appeals erred by affirming the trial court's denial of defendant's pretrial motion for appointment of a psychiatrist at state expense to assist in the preparation and presentation of his defense. We hold it did and therefore reverse and remand for a new trial.

I.

Defendant Jonathan Parks was convicted by a Graham County jury on numerous charges stemming from a bizarre three and one-half hour ordeal in which he held his half sister at gunpoint, threatening her life, and rambling about such diverse topics as war leaders and childhood memories of their father. Following is an account based on testimony and evidence produced at defendant's trial and sentencing hearing.

Defendant, twenty-four years old at the time of trial, had a history of psychiatric problems. In fact, he had checked himself

into Angel Community Hospital for psychiatric treatment on 5 January 1988. On 15 January 1988, defendant, against the advice of his doctors, left the hospital and went to his half sister's home located about four miles from Robbinsville, North Carolina.

Martha Parks, defendant's half sister, was director of Graham County Social Services in January 1988. When she arrived home from work around 5 p.m. on 15 January, she noticed that two panes of glass had been broken out of her patio door. Once inside the house, she saw defendant coming down the hall with a shotgun pointed at her. Miss Parks testified that defendant's face was flushed, he was extremely agitated and he had a "strange smile on his face." Defendant asked Miss Parks if she knew what a mess a shotgun would make. He then proceeded to tell Miss Parks that she did not deserve to live, that she had deprived him of his "birthright," and that there were other people in Graham County who also deserved to die. Defendant then asked Miss Parks if she was ready to make peace with God. Defendant was "very, very angry — very, very — filled with anger," she testified.

After a period of time, Miss Parks told defendant that she was cold, noting that defendant had broken out two panes of glass in the patio door. Defendant said he would repair the door if Miss Parks had a piece of cardboard. Miss Parks gave defendant a cardboard box, and he placed it over the open space in the door.

Miss Parks testified that defendant told her at some point during the evening that he had found a gun and ammunition that she kept in the house and had loaded it. Soon thereafter, defendant said: "I'll tell you what. I'll give you a chance. I'll put your gun on the table and we'll draw." Defendant then tossed the gun on a table. Miss Parks said she kept her hands in her pocket and told defendant that she was not a violent person.

During the next few hours, defendant talked constantly. He talked about having just been released from the psychiatric unit in Franklin and how the psychiatrists were trying to make him crazy. He talked about war leaders, about his great admiration for Vietnamese and Israeli soldiers. "We had a rather intellectual discussion on war leaders," Miss Parks recalled during testimony. He talked about the death of his mother and about his childhood memories of their father.

Before leaving her house, defendant said he was taking $40 and Miss Parks' gun. Miss Parks handed defendant two twenty dollar bills out of her purse. Finally, around 8:30 p.m., defendant left the house. Miss Parks testified she "was still like numb. This was a period of three and a half hours."

Five minutes later, there was a knock at the door. When Miss Parks went to investigate, she heard defendant say, "I've dropped my shotgun in the snow. I need a flashlight." Miss Parks gave defendant a flashlight. Within a few minutes, defendant returned the flashlight, saying he had found the shotgun. Defendant left once more.

A short while later, while still debating whether to call the sheriff, Miss Parks heard a gunshot. Believing defendant was still on her property, Miss Parks called Graham County Sheriff Melvin Howell, who promptly came to her home. Sheriff Howell contacted Deputy Richard Lofty and told him to pick up defendant and bring him to jail. Deputy Lofty, who was already responding to a disturbance call of someone cursing and shooting on the highway, spotted defendant walking along Highway 129 about two miles from Miss Parks' house. Deputy Lofty testified that he pulled his patrol car next to defendant and told him to get inside. Defendant responded that he was a "freedom fighter" and would not get into the car. After being ordered into the patrol car a second time, defendant complied and was taken to jail.

Defendant, who acted as his own attorney at trial,[1] called only one witness, former Graham County Sheriff's Deputy Jerry Crisp. Defendant asked Deputy Crisp whether defendant's rights had been read to him when he was arrested. Deputy Crisp replied that defendant was advised of his rights prior to being interviewed, and that defendant declined to make a statement. Defendant requested that he be allowed to submit a written statement in lieu of giving oral testimony. Judge Downs sustained the State's objection, and defendant did not testify. Defendant also chose not to address the jury during closing arguments.

---

1. After twice trying to "fire" his court-appointed attorney prior to trial, defendant requested at trial that he be allowed to represent himself. After questioning defendant and making findings of fact, Judge Downs allowed defendant to represent himself, with his appointed attorney acting as standby counsel.

STATE v. PARKS

[331 N.C. 649 (1992)]

Defendant was convicted of felonious breaking and entering, second-degree kidnapping, larceny of a firearm, robbery with a dangerous weapon, and carrying a concealed weapon. He was sentenced to twenty-six years in prison. The Court of Appeals, in an unpublished opinion, upheld defendant's convictions. *State v. Parks*, 102 N.C. App. 354, 402 S.E.2d 662 (1991). Defendant appealed as of right based on a substantial constitutional question. N.C.G.S. § 7A-30(1) (1989). Defendant also filed a petition for discretionary review pursuant to N.C.G.S. § 7A-31. The State filed a motion to dismiss the appeal. Defendant's petition for discretionary review and the State's motion to dismiss the appeal were denied by this Court. *State v. Parks*, 329 N.C. 503, 407 S.E.2d 548 (1991).

II.

Prior to trial, on 20 May 1988, defendant's appointed counsel, James L. Blomeley, Jr., filed a written Motion for Appointment of Psychiatrist. The motion stated that defendant was indigent, that he had been recently diagnosed at Dorothea Dix Hospital as having a "mixed personality disorder with schizoid, dependent, inadequate and avoidant features," and was found to be suffering from delusions. The motion also noted that defendant had been previously evaluated at Dorothea Dix Hospital in relation to another criminal case. In that earlier case, psychiatrists concluded that "his crime seems to be the result of mental impairment." Attorney Blomeley concluded that he was "of the opinion that a full psychiatric evaluation of Mr. Parks would be [of] great importance in fully preparing an adequate defense in this matter."

Judge Downs listened to oral arguments prior to ruling on defendant's motion. At the hearing, Judge Downs reviewed defendant's Dorothea Dix Discharge Summary prepared on 5 February 1988 by state psychiatrist Dr. Bob Rollins.[2] The Discharge Summary stated, in pertinent part:

SOCIAL HISTORY: Mr. Parks was evaluated by the undersigned [Dr. Rollins] on somewhat similar charges in April, 1987. Diagnosis at that time was Mixed Personality Disorder. Mr. Parks has had past diagnoses of Schizophrenia and Dependent

---

2. Defendant had been ordered to undergo a psychiatric evaluation at Dorothea Dix Hospital to determine if he was competent to stand trial. The order was issued at the request of the *prosecutor* because defendant refused to talk with his attorney.

Personality. Subsequent to that evaluation, Mr. Parks got an active sentence on those charges and was released from prison November 6, 1987. During that incarceration he took neuroleptic medication and it was the opinion of clinicians that there were [sic] some slight improvement in his overall mental state as [a] result of medication. . . .

HOSPITAL COURSE: Mr. Parks refused neuroleptic medication. He indicated that he did not wish to be in the Forensic Unit and was relatively uncooperative with the evaluation process.

OPINIONS: Mr. Parks has longstanding adjustment problems. At times these have been viewed as representing Schizophrenia, but the present clinical picture suggest[s] a longstanding and severe personality disorder. Mr. Parks does not have a mental disorder that would prevent him from being capable to stand trial or being responsible for his actions. Any lack of cooperation on his part is willful. . . .

Dr. Rollins also noted in the Discharge Summary that "[d]elusional beliefs may be present. . . . Intellectual functions are dull and judgment and insight are impaired." The principal diagnosis was mixed personality disorder with schizoid, dependent and avoidant features.

During the hearing on defendant's motion, attorney Blomeley informed Judge Downs that defendant's April 1987 evaluation mentioned in Dr. Rollins' current report "comes down much more heavily on the notion that the illness or whatever the problem is, is a substantial contributing factor and influences the way that he views the world . . . ." Mr. Blomeley argued that, "the nature of what is alleged [in this case] indicates a significant likelihood that there was a problem of this sort involved and I think that it calls for some kind of . . . evaluation toward that end."

Mr. Blomeley also informed Judge Downs that defendant "has been hospitalized at Angel Hospital and has had significant contact with Smokey Mountain Mental Health." In addition, Judge Downs was made aware that Dr. Rollins was "on call" for the prosecution, having been subpoenaed by assistant district attorney Christina B. Clapsaddle.

Judge Downs, attempting to get to the heart of the matter, said to Mr. Blomeley:

STATE v. PARKS

[331 N.C. 649 (1992)]

Well, you are not asking for an examination, you want an appointment of an expert to assist you in the trial preparation and maybe be a witness on the merits of the sanity issue, prospective sanity issue.

To which Mr. Blomeley responded:

That is quite true. Now of course, it is entirely possible that if someone was appointed they wouldn't do anything in the world from that point of view; they may agree with Dr. Rollins. But assuming their views came out like I suspected that they would, I would want that expert available for that purpose, your Honor.

Judge Downs, before denying defendant's motion, explained:

Well, when you send someone to the State hospital and the State psychiatrist says that they are totally competent and there is no question about any sort of mental illness or any mental disease, and the other side needs their own psychiatrist or psychologist, usually that is the scenario from [sic] appointing one. But this one, this particular doctor [Dr. Rollins] agrees with you some. I don't know if he would be more help than anybody that you could get in addition to that.

III.

An indigent defendant's right to the assistance of an expert at state expense "is rooted in the Fourteenth Amendment's guarantee of fundamental fairness and the principle that an indigent defendant must be given a fair opportunity to present his defense." *State v. Tucker*, 329 N.C. 709, 718, 407 S.E.2d 805, 811 (1991). This Court recognized the constitutional implications of an indigent defendant's request for expert assistance nearly a decade before the United States Supreme Court decided *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), the landmark case which guaranteed indigent defendants the right to expert assistance under certain circumstances. *See State v. Tatum*, 291 N.C. 73, 81, 229 S.E.2d 562, 567 (1976). In *State v. Moore*, 321 N.C. 327, 364 S.E.2d 648 (1988), we set out in detail the appropriate standard under *Ake* and our cases for determining whether an indigent defendant is entitled to a state-funded expert to assist in the preparation and presentation of his defense. We said:

In *Ake* the Supreme Court held that when a defendant makes a preliminary showing that his sanity will likely be a "significant factor at trial," the defendant is entitled, under the Constitution, to the assistance of a psychiatrist in preparation of his defense. *Id.* at 74, 84 L. Ed. 2d at 60. We have applied the holding in *Ake* to instances when an indigent defendant moved for the assistance of experts other than psychiatrists, holding that such experts need not be provided unless the defendant "makes a threshold showing of specific necessity for the assistance of the expert" requested. *State v. Penley*, 318 N.C. 30, 51, 347 S.E.2d 783, 795 (1986) (pathologist). *See State v. Hickey*, 317 N.C. 457, 468, 346 S.E.2d 646, 654 (1986) (investigator); *State v. Johnson*, 317 N.C. 193, 199, 344 S.E.2d 775, 779 (1986) (medical expert).

In order to make a threshold showing of specific need for the expert sought, the defendant must demonstrate that: (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case. *State v. Johnson*, 317 N.C. at 198, 344 S.E.2d at 778. This test was developed originally under N.C.G.S. § 7A-450(b), which provides that the state must furnish an indigent defendant "with counsel and the other necessary expenses of representation." Subsequent to the Supreme Court's *Ake* decision, we reaffirmed this standard as that which the defendant must meet in order to assert a constitutional right to the assistance of experts. *State v. Johnson*, 317 N.C. at 199, 344 S.E.2d 775 [sic] at 778; *State v. Massey*, 316 N.C. 558, 566, 342 S.E.2d 811, 816 (1986). In determining whether the defendant has made the requisite showing of his particularized need for the requested expert, the court "should consider all the facts and circumstances known to it at the time the motion for psychiatric assistance is made." *State v. Gambrell*, 318 N.C. 249, 256, 347 S.E.2d 390, 394 (1986).

*Moore*, 321 N.C. at 335-36, 364 S.E.2d at 652. In short, *Ake*'s "significant factor" test is satisfied when an indigent defendant makes a particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case. *See State v. Wilson*, 322 N.C. 117, 125, 367 S.E.2d 589, 594 (1988). The particularized showing demanded by our cases is a flexible

STATE v. PARKS

[331 N.C. 649 (1992)]

one and must be determined on a case-by-case basis, *Moore*, 321 N.C. at 344, 364 S.E.2d at 657; however, "[m]ere hope or suspicion that favorable evidence is available is not enough to require that such help be provided." *State v. Holden*, 321 N.C. 125, 136, 362 S.E.2d 513, 522 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988).

[1] Defendant argues that he met this burden, listing the following nine "facts and circumstances" which were before the trial court at the time his motion was denied:

(1) defendant anticipated relying on the insanity defense at trial;

(2) defendant had longstanding mental illness requiring professional attention;

(3) defendant was currently diagnosed by Dr. Rollins as suffering from severe personality disorder with schizoid, dependent and avoidant features;

(4) defendant had previously been diagnosed as suffering from schizophrenia;

(5) defendant may have delusional beliefs;

(6) defendant's attorney, based on his experience with defendant and knowledge of the facts, "suspected" that another mental health professional would find defendant even "sicker" than Dr. Rollins found him to be;

(7) defendant was administered neuroleptic medication[3] while incarcerated in 1987 and was offered neuroleptic medication while being evaluated at Dorothea Dix Hospital in February 1988;

(8) defendant was charged with "similar" offenses in 1987, and at that time Dr. Rollins apparently believed that the crime "seem[ed] to be the result of mental impairment";

(9) the prosecutor already had Dr. Rollins "on call" as a mental health expert for the State.

After reviewing the record, we agree with defendant that these facts and circumstances were before the trial court at the time defendant's motion was denied. We also agree with defendant

---

3. A neuroleptic drug is one "that favorably modifies psychotic behavior." *Dorland's Illustrated Medical Dictionary* 887 (26th ed. 1985).

that, based upon these facts, the trial court erred by denying defendant's motion for a psychiatrist at state expense.

Although Dr. Rollins ultimately concluded in his Discharge Summary that defendant's mental disorder did not prevent him from "being responsible for his actions," we agree with defendant's trial attorney that another mental health expert may have come to a different conclusion. The question under *Ake*, as we said in *Gambrell*, "is not whether defendant has made a *prima facie* showing of legal insanity. The question is whether, under all the facts and circumstances known to the court at the time the motion for psychiatric assistance is made, defendant has demonstrated that his sanity when the offense was committed will likely be at trial a significant factor." *Gambrell*, 318 N.C. at 256, 347 S.E.2d at 394. (Footnote omitted). And, as previously noted, the *Ake* standard is satisfied when a defendant has made a particularized showing that he will either be deprived of a fair trial without the expert assistance, or that there is a reasonable likelihood that the expert assistance would materially assist him in the preparation of his case. *See Wilson*, 322 N.C. at 125, 367 S.E.2d at 594.

Based upon the aforementioned facts, we hold that defendant met his burden and was entitled to a psychiatrist at state expense. Not only had defendant been previously diagnosed as being schizophrenic, his current diagnosis "suggest[ed] a *longstanding and severe* personality disorder," possibly accompanied with delusional beliefs. (Emphasis added). Defendant's attorney informed the trial court that he would pursue an insanity defense if the court-appointed psychiatrist believed such a defense was viable. Finally, the prosecutor herself clearly anticipated the possibility of an insanity defense, having already subpoenaed Dr. Rollins. Certainly, the evidence before the trial court established more than a "mere hope or suspicion" that a court-appointed psychiatrist would be able to materially assist in the preparation and presentation of defendant's case.

[2] The State relies primarily on this Court's *Gambrell* decision for its argument that defendant did not make a particularized showing of his need for the assistance of a psychiatrist in preparing and presenting his defense. The State suggests that *Gambrell* stands for the proposition that in order to receive the assistance of a state-funded mental health expert a defendant must present evidence of psychiatric problems between the time of his arrest and the

time at which he requests the expert assistance. Because defendant in this case did not present such evidence, the State argues, the trial court was correct in denying his motion. The State misreads *Gambrell*. Although there was evidence in that case of psychiatric problems between the time of defendant's arrest and the time at which he requested the assistance of a psychiatrist, the Court stated in no uncertain terms that the critical time period was the *time of the offense*. "The issue," we said, "resolves itself into whether defendant made 'a preliminary showing that his sanity *at the time of the offense* [was] likely to be a significant factor at trial.'" *Gambrell*, 318 N.C. at 256, 347 S.E.2d at 394 (quoting *Ake v. Oklahoma*, 470 U.S. at 74, 84 L. Ed. 2d at 60) (emphasis added). Thus, while evidence of psychiatric problems during the interval between arrest and the motion for appointment of a psychiatrist may be considered by the trial court in determining whether to grant the motion, lack of such evidence is certainly not dispositive.

[3] Finally, we note that the reason stated by the trial court in denying defendant's motion for a court-appointed psychiatrist was rejected by this Court in *Moore* and *Gambrell*. The trial court said, in essence, that there was no need to appoint a psychiatrist to assist defendant because Dr. Rollins from Dorothea Dix Hospital had already examined defendant, and his conclusions were somewhat favorable to defendant. Therefore, the trial court said, another psychiatrist would be of little value. Putting aside whether Dr. Rollins' conclusions were in fact favorable to defendant, we said in *Gambrell* that what is required by *Ake* is that a "defendant be furnished with a competent psychiatrist for the purpose of not only examining defendant but also assisting defendant in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases." *Gambrell*, 318 N.C. at 259, 347 S.E.2d at 395; *see also Moore*, 321 N.C. at 338-39, 364 S.E.2d at 653-54. Dr. Rollins was not appointed to assist defendant in this case. His only role was to determine if defendant was competent to stand trial. Dr. Rollins' involvement, therefore, "did not fulfill the state's constitutional obligation as *Ake* expounded it." *Gambrell*, 318 N.C. at 259, 347 S.E.2d at 395; *Moore*, 321 N.C. at 339, 364 S.E.2d at 654.

Because the trial court's error in denying defendant's motion for the appointment of a psychiatrist is of constitutional magnitude, and because we cannot say that the error was harmless beyond a reasonable doubt, N.C.G.S. § 15A-1443(b) (1988), defendant is en-

titled to a new trial. We therefore reverse the decision of the Court of Appeals and remand this case to that court for further remand to Superior Court, Graham County, for a new trial.

Reversed and remanded.