STATE OF NORTH CAROLINA v. JAMES CALVIN BERNARD MILLS

No. 392PA91

(Filed 4 September 1992)

**1. Indigent Persons § 19 (NCI4th)— motion for funds to hire experts—failure to show particularized need**

The trial court did not err in denying the pretrial motion of a defendant charged with first degree murder for funds to employ experts in the fields of psychiatry or psychology, forensic serology, DNA identification testing, forensic chemistry, genetics, metallurgy, pathology, private investigation and canine tracking where defendant failed in his motion to make a showing of particularized necessity for the appointment of experts.

**Am Jur 2d, Criminal Law §§ 771, 1006.**

**Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19; Right of indigent defendant in state criminal case to assistance of chemist, toxicologist, technician, narcotics expert, or similar nonmedical specialist in substance analysis. 74 ALR4th 388.**

**2. Indigent Persons § 24 (NCI4th)— pretrial motion for appointment of DNA expert—failure to show particularized need—failure to renew motion at trial**

Defendant's assertion in his pretrial motion that he was in need of an expert in DNA testing "so that he may adequate-

ly prepare for introduction of such evidence, if any, at trial" was insufficient to demonstrate a particularized need for the appointment of an expert in DNA testing. Furthermore, the trial court did not err in denying defendant's motion for the appointment of a DNA expert because a need for such an expert became evident when the State introduced DNA evidence at trial where defendant did not renew his motion for appointment of a DNA expert or call to the court's attention specific circumstances showing a particularized need.

**Am Jur 2d, Criminal Law §§ 771, 1006.**

**Right of indigent defendant in state criminal case to assistance of psychiatrist or psychologist. 85 ALR4th 19; Right of indigent defendant in state criminal case to assistance of chemist, toxicologist, technician, narcotics expert, or similar nonmedical specialist in substance analysis. 74 ALR4th 388.**

3. **Criminal Law § 113 (NCI4th) — discovery — late furnishing of lab reports — no bad faith by State — dismissal of charges refused**

The trial court did not abuse its discretion by denying defendant's motion to dismiss for failure of the State to comply with discovery procedures because laboratory reports were furnished by the district attorney's office to defendant after the commencement of the trial where the evidence supported the trial court's findings that the long time lapse between the submission of items to the S.B.I. laboratory and the receipt of its analysts' reports by the district attorney resulted from an unavoidable turnover in S.B.I. personnel rather than from any bad faith on the part of the State, and that there was no inexcusable delay by the district attorney in delivering the lab reports in a timely fashion after he received them.

**Am Jur 2d, Depositions and Discovery §§ 427, 449.**

**Exclusion of evidence in state criminal action for failure of prosecution to comply with discovery requirements as to physical or documentary evidence or the like — modern cases. 27 ALR4th 105.**

**Withholding or suppression of evidence by prosecution in criminal case as vitiating conviction. 34 ALR3d 16.**

**4. Criminal Law § 113 (NCI4th) — discovery — evidence not contained in report — offer of mistrial rather than dismissal**

The trial court did not abuse its discretion by offering to grant a mistrial rather than a dismissal of the charges against defendant for failure of the State to comply with discovery requirements when information not contained in a serologist's report furnished to defendant — that luminol sprayed in a bathroom cabinet of defendant's trailer produced a positive reaction for blood — was introduced into evidence where the trial court concluded that this evidence was merely corroborative of other evidence; the trial court admonished the prosecutor to screen any further scientific evidence to ensure that it comported with discovery disclosures made to the defense; and the trial court found that the State did not act in bad faith during discovery. The trial court's admonition to the prosecutor and offer of a mistrial to defendant were proper exercises of discretion supported by reason.

**Am Jur 2d, Depositions and Discovery §§ 427, 449.**

**Exclusion of evidence in state criminal action for failure of prosecution to comply with discovery requirements as to physical or documentary evidence or the like — modern cases. 27 ALR4th 105.**

**Withholding or suppression of evidence by prosecution in criminal case as vitiating conviction. 34 ALR3d 16.**

**5. Evidence and Witnesses § 2923 (NCI4th) — direct examination of own witness — impeachment by prior charges not permitted**

A defendant charged with murder could not call the victim's husband as a defense witness and then attempt to impeach him by inquiring into prior charges or indictments against the husband for killing his first wife and shooting his second wife since a party is not free on direct examination to impeach his witness by evidence of specific acts or prior convictions. N.C.G.S. § 8C-1, Rules 608, 609.

**Am Jur 2d, Witnesses §§ 978-984.**

**6. Evidence and Witnesses § 295 (NCI4th) — murder victim's husband — crimes against previous wives — inadmissibility**

Evidence that a murder victim's husband had committed crimes against his previous wives was inadmissible if its only

purpose was to prove his character in order to show that he acted in conformity therewith by killing the victim. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Witnesses § 895.**

7. **Evidence and Witnesses § 113 (NCI4th)— alternative theory of murderer's identity — prior charges against victim's husband — inadmissibility**

In a prosecution for first degree murder, defendant's proposed questioning of the victim's husband about prior charges and indictments against the husband for killing his first wife and shooting his second wife was not admissible under the holding of *State v. McElrath*, 322 N.C. 1 (1988), to support an alternative theory as to the murderer's identity where defendant presented no other evidence tending to support the alternative theory that the husband killed the victim even though the trial court determined that some of the evidence proffered by defendant for this purpose on voir dire was probably competent.

**Am Jur 2d, Evidence § 441.**

8. **Evidence and Witnesses § 1486 (NCI4th)— identification of knife — sufficient foundation**

A sufficient foundation was presented for a witness to identify the alleged murder weapon, a knife, as belonging to defendant where the witness, before being shown the knife at trial, had already testified in detail as to the appearance of defendant's knife prior to and on the day of the murder and that he had compared the knife with his own.

**Am Jur 2d, Evidence § 774.**

APPEAL by defendant as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by *Albright, J.*, at the 27 February 1989 Criminal Session of Superior Court, ROWAN County, upon a verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 12 May 1992.

*Lacy H. Thornburg, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*David Y. Bingham for defendant-appellant.*

STATE v. MILLS

[332 N.C. 392 (1992)]

FRYE, Justice.

Defendant, James Calvin Bernard Mills, was indicted on one count of first-degree murder by a Rowan County grand jury. Defendant was tried capitally to a jury, which returned a verdict of guilty of murder in the first degree on the basis of malice, premeditation and deliberation. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of life imprisonment, and the trial judge imposed judgment accordingly. Defendant gave notice of appeal to this Court on 29 March 1989. The record on appeal was not timely filed; however, on 2 October 1991 we allowed defendant's petition for writ of certiorari in order to permit a direct appeal of his murder conviction.

Defendant brings forward several assignments of error. After a thorough review of the record, we conclude that defendant received a fair trial, free of prejudicial error.

I.

The State presented evidence tending to show the following facts and circumstances. On 19 April 1987, the body of Carolyn Odessa Mills was found in her apartment at Number 53 Weant Street Apartments, East Spencer, North Carolina. The victim had multiple stab wounds to the body. Dr. Cheryl Thorn, a forensic pathologist, testified that, in her opinion, the cause of death was exsanguination, the loss of blood.

Prior to her death, the victim had been living with her husband, James E. "Speedy" Mills, and her son, Leroy Thomas, in Apartment Number 54 on Weant Street. A few days before the murder, the family moved to Number 53 because Number 54 was being remodeled. The day before her murder, the victim was the only one who had keys to Number 53. That day, when Thomas returned to Number 53, he could not get into the apartment. He walked to the nearby mobile home of defendant, Bernard Mills, son of the victim's husband, Speedy Mills. Defendant said that he had a key which fit Number 53, but when they returned to the apartment, the key would not unlock the door. Defendant then retrieved a green knife, and cut a hole in the screen door. He and Thomas eventually pried the door open. At trial, Thomas described defendant's knife as having a green handle with a circular emblem of an animal in the middle. Thomas testified that while

they were trying to get into the apartment, he compared his own knife to that of defendant, and they were very similar in size.

On the morning of 19 April, Thomas received a message from Speedy Mills that he could not get into Number 53. Thomas asked the maintenance supervisor to let them into the apartment. Upon entering the apartment, Thomas went into the kitchen and saw blood everywhere. When he looked around the corner, he saw his mother's body on its back in the living room, and "got out of there." He observed that his mother was wearing a negligee and that she had a bad wound to her neck. Speedy said, "Oh, God, my wife is dead." Thomas then went to defendant's mobile home to tell him what had happened. Defendant and Thomas returned to Number 53 and stood outside. While outside, Thomas asked defendant if he could borrow defendant's knife to scrape something from the windshield of his car. Defendant replied that his knife was in his trailer.

Detective T. A. Swing of the Rowan County Sheriff's Department photographed the crime scene and the body and collected physical evidence. Two of the victim's fingertips had been cut off and were found in the kitchen. Detective Swing testified that in addition to the blood in the apartment, a green-handled knife was pointed out to him by Max Bryant, Area Supervisor of the State Bureau of Investigation (S.B.I.), in the wooded area behind Number 53. The blade was dull and bloody, and the tip of the knife was missing. Detective Swing used a diagram and an aerial photograph to illustrate the relatively close location of Number 53 to defendant's mobile home. Detective Swing testified that during a search of defendant's mobile home on 21 April, he discovered two pairs of socks—a black nylon pair and a gray athletic pair—as well as a pair of white athletic shoes. The gray socks had a reddish-brown stain in the area where the ball of the foot would be. On 28 April, pursuant to a search warrant, blood, head hair, and pubic hair were taken from defendant and submitted to the S.B.I. laboratory.

Sandra Walker, defendant's ex-girlfriend, testified that on the night of 18 April, she saw defendant leaving Weant Street between 9 and 10 p.m. They acknowledged each other in passing.

Eric Mitchell, a friend of defendant, testified that they were together drinking alcohol the evening of 18 April. At the time, defendant had his lock-blade pocketknife with him. Mitchell testified that defendant said that the victim was the cause of his and Sandra

Walker's breakup. Mitchell testified that a few days later defendant told him that the police wanted to speak to Mitchell and that if he were asked about a knife, he was to tell them that he, Mitchell, had asked defendant for a knife on the night of the murder, but defendant did not have one. Mitchell identified the knife at trial but observed that the blade had a point when he saw it earlier.

Benita Chalk testified that about 2 a.m. on 19 April, defendant, who wanted to date her, knocked on her door and awakened her. After fifteen or twenty minutes, she still would not let him in. Defendant left, walking in the direction of Number 53 and in the opposite direction from his mobile home.

S.B.I. Agent D.J. Spittle, of the Serology Unit, testified that he had received a number of blood samples from items taken from defendant's apartment, including shoes, socks, and fibers taken from the carpet, couch, and walls. The victim's blood type was B; defendant's blood type was A. The blood taken from the knife was type B. The blood on the athletic socks was consistent with the victim's blood and could not have come from defendant, unlike the blood on the tennis shoes.

S.B.I. Special Agent Troy Hamlin, an expert in the fields of hair examination and comparison and physical match comparison, testified that he had examined the knife, and the victim's bandana, gown and robe and compared the hairs thereon to her known head hair. The hairs were microscopically consistent. Agent Hamlin also testified that he had compared the knife tip embedded in the victim's skull with the knife alleged to be defendant's, and that in his opinion, the tip was an exact match to the missing portion of the knife blade.

Dr. George Herrin, staff scientist at Cellmark Diagnostics, explained the process of Deoxyribonucleic acid (DNA) identification testing to the jury. Dr. Wesley Kloos, professor of genetics and microbiology at North Carolina State University, testified that he was familiar with the techniques that Dr. Herrin had discussed and that such techniques were widely accepted in the medical community.

Karen Rubenstein, a molecular biologist with Cellmark Diagnostics, was accepted as an expert in DNA identification testing. She testified that from her analysis of defendant's socks and the

victim's bandana, the blood found on both originated from the same person.

S.B.I. Special Agent Bill Lane testified that during an interview with defendant after defendant's arrest, defendant stated that on the night that the victim was killed he was "super intoxicated," and did not remember anything until Leroy Thomas knocked on the door the next morning. Defendant stated that he could have, or could not have, killed the victim. On cross-examination, Special Agent Lane admitted that defendant consistently denied killing the victim.

Defendant testified in his own behalf. He testified that after he left Benita Chalk's apartment, he returned to his trailer. He undressed and went to bed. He was awakened by Leroy Thomas, with news that Thomas' mother had been killed. Defendant testified that he kept his knife in a white bucket in his trailer, so when Thomas asked to use his knife to scrape something from his windshield, he told him it was in the trailer. When he returned to his mobile home to get the knife, it was missing. Defendant denied that the socks introduced into evidence were his. He also denied that the knife introduced into evidence as the murder weapon was his. He stated that he had never admitted to anyone that he could have killed the victim.

II.

[1] Defendant first contends that the trial court committed reversible error by denying his pretrial motion for appointment of experts. Defendant filed a Motion for the Appointment of Experts seeking funds to employ experts in the fields of psychiatry or psychology, forensic serology, DNA identification testing, forensic chemistry, statistics, genetics, metallurgy, pathology, private investigation, and canine tracking. The trial court entered an order denying defendant's motion on the ground that defendant had failed to demonstrate a sufficient particularized need for such experts, concluding that "[d]efendant's request as presented amounted to little more than a highly fanciful 'wish list.'" The State argues that the trial court properly exercised its discretion in denying defendant's motion on the grounds that defendant failed to show the availability of any of the ten or more experts he requested, he failed to present any reasonable assessment of the costs involved, and he failed to make a threshold showing in his motion for the appointment of experts. We agree with the trial court

and the State that defendant, in his pretrial motion, failed to make a showing of particularized necessity for the appointment of experts.

The statutory and common law principles governing the appointment of an expert witness for an indigent defendant are well settled. N.C.G.S. § 7A-450(b) provides in relevant part:

> (b) Whenever a person, under the standards and procedures set out in this Subchapter, is determined to be an indigent person entitled to counsel, it is the responsibility of the State to provide him with counsel and the other necessary expenses of representation.

N.C.G.S. § 7A-450(b) (1986). Section 7A-454 provides:

> The court, in its discretion, may approve a fee for the service of an expert witness who testifies for an indigent person, and shall approve reimbursement for the necessary expenses of counsel. Fees and expenses accrued under this section shall be paid by the State.

N.C.G.S. § 7A-454 (1986).

An indigent defendant must demonstrate that the matter subject to expert testimony is " 'likely to be a significant factor' " at trial. *State v. Moore*, 321 N.C. 327, 344, 364 S.E.2d 648, 657 (1988) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 82, 84 L. Ed. 2d 53, 60 (1985) ). A defendant satisfies this burden by demonstrating that the assistance of an expert would materially assist him in the preparation of his defense, or that the denial of this assistance would deprive him of a fair trial. *State v. Parks*, 331 N.C. 649, 658, 417 S.E.2d 467, 472 (1992). " 'Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided.' " *Id.* (quoting *State v. Holden*, 321 N.C. 125, 136, 362 S.E.2d 513, 522 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988) ). This "particularized showing demanded by our cases is a flexible one and must be determined on a case-by-case basis." *Id.* The determination of whether a defendant has made an adequate showing of particularized necessity lies within the discretion of the trial judge. *State v. Watson*, 310 N.C. 384, 390, 312 S.E.2d 448, 453 (1984). In determining whether the defendant has made the requisite showing, the court " 'should consider all the facts and circumstances known to it at the time the motion for [expert] assistance is made.' " *Parks*, 331 N.C. at 656, 417

STATE v. MILLS

[332 N.C. 392 (1992)]

S.E. 2d at 471 (quoting *State v. Moore*, 321 N.C. at 335-36, 364 S.E.2d at 652) (citation omitted).

[2] In his brief and during oral argument, defendant placed emphasis upon the trial court's denial of his motion to appoint a DNA expert. Because we believe defendant's argument that a DNA expert should have been appointed is his strongest argument, we focus our attention on the DNA expert as well. In support of his request for the appointment of a DNA expert, defendant set forth the following in his motion:

> Defendant is informed and believes, and therefore alleges, after timely discovery by the State of North Carolina, that the State intends to submit the sock mentioned supra for special examination, to wit for DNA identification. This is a process of which Defendant has as yet been unable to discuss because of, at least, the novelty of the process. Defendant is in need of an expert in Deoxyribonucleic Acid Identification Testing so that he may adequately prepare for introduction of such evidence, if any, at trial.

In support of *each* of the ten experts requested, defendant presented the following in his motion:

> If Defendant is not provided with the assistance that he requests, he will be denied equal protection of the law and due process in violation of the Fourteenth Amendment on [sic] the Constitution. The services of each of the above experts is necessary to enable the Defendant to prepare effectively for trial, evidence on his own behalf, and to cross-examine the State's expert witnesses. The evidence which will be the subject of expert opinion it [sic] critical to a determination of which penalty is appropriate. In addition, the analyses which will be performed by the experts will entail subjective opinion about which experts may disagree. Without expert assistance, the Defendant has no means available to review such evidence, and determine the reliability, or lack thereof, of any analyses performed, or to present evidence in his own behalf. Thus, denial of expert assistance in the circumstances presented here will deprive the Defendant of his right to present a defense, his right to the effective assistance of counsel and his right to present mitigating evidence will be abridged in violation of the Eighth and Fourteenth Amendments to the Constitution and Defendant's rights under the procedures set forth in

N.C.G.S. 15A-2000, *et seq.*, especially as it applies to the presentence hearing.

Defendant now argues that "given the new field of study, the fact that this Court had not even ruled on the admissibility of DNA evidence at the time of . . . trial[1], and the importance of the expert testimony to the State's case[,]" he did make a sufficiently particularized showing of need, and that the trial court's denial of his motion deprived him of a fair trial. We disagree.

In his motion seeking the appointment of an expert in DNA identification testing, defendant asserted that he was "in need of an expert in Deoxyribonucleic Acid Identification Testing so that he may adequately prepare for introduction of such evidence, *if any*, at trial." (Emphasis added.) As quoted above, this reasoning was essentially the same reasoning given by defendant in support of his motion for appointment of all of the experts. While defendant did show that appointment of the experts might help him in general at trial, he did not do so with the degree of particularity required under other cases deciding this issue. *E.g., Parks*, 331 N.C. 649, 653, 417 S.E.2d 467, 472 (error for trial court to deny motion for appointment of a psychiatrist where specific "facts and circumstances" demonstrating need were before the court at time of the motion). To the contrary, defendant's showing demonstrates no more than a general desire to have an expert assist him in some vague manner in the event that DNA evidence might be introduced at trial. Such a showing is insufficient. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1, 86 L. Ed. 2d 231, 236 n.1 (1985) ("undeveloped assertions that the requested assistance would be beneficial" insufficient); *State v. Hickey*, 317 N.C. 457, 469, 346 S.E.2d 646, 654 (1986) (mere general desire to discover evidence which might be used for impeachment purposes does not satisfy the requirement that a defendant demonstrate a threshold showing of need); *State v. Johnson*, 317 N.C. 193, 199, 344 S.E.2d 775, 779 (1986) (mere assertion that expert was needed to analyze all available information and to possibly testify on the defendant's behalf insufficient showing of particularized need in absence of specific facts). We hold, therefore, that at the time the motion was made, the facts

---

1. In *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990), decided after defendant's trial, this Court held that DNA evidence was admissible at trial as a new scientific method of proof because its reliability had been established by expert testimony.

and circumstances known to the trial court did not amount to a threshold showing of particularized necessity. *See Ake*, 470 U.S. 68, 84 L. Ed. 2d 53; *Parks*, 331 N.C. 649, 417 S.E.2d 467; *Moore*, 321 N.C. 327, 364 S.E.2d 648.

Notwithstanding any failure to show a particularized need at the time of his motion for the DNA expert, defendant, at oral argument, contended that such need became evident during the course of the trial. However, defendant did not renew his motion for appointment of a DNA expert, nor did he call to the court's attention specific circumstances showing a particularized need. We hold, therefore, that the trial court did not err in denying defendant's motion.

[3] In his next argument, defendant contends that the trial court committed reversible error by denying his motion to dismiss for failure of the State to comply with discovery procedures in violation of his constitutional and statutory rights. Defendant argues that the receipt of two reports after the commencement of trial on 27 February 1989 resulted in his prejudice: 1) On the afternoon of the first day of trial, defendant was provided with a laboratory report concerning results of tests performed on the alleged murder weapon; and 2) on 2 March 1989, defendant was provided with a laboratory report pertaining to latent lifts and fingerprints, the crime scene search, and the murder weapon. Defendant also contends that a third report, that of serologist Agent D.J. Spittle, although received before trial, was provided to him several months after the assistant district attorney received it and that information different from that contained in the report was allowed into evidence, all to his prejudice.

The State contends that there is no showing of bad faith on its part and no showing of dilatory action in the transmission of the laboratory reports from the district attorney's office to the defense. The State further argues that sanctions for violating discovery rules are within the discretion of the trial judge and will not be disturbed absent a showing of an abuse of discretion. We agree with the State and hold that the trial court did not abuse its discretion in denying defendant's motion to dismiss.

This Court discussed the principles regarding discovery procedures in the recent case of *State v. Tucker*, 329 N.C. 709, 407 S.E.2d 805 (1991):

The purpose of these procedures is to protect the defendant from unfair surprise. *State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990), *cert. denied*, --- U.S. ---, 112 L. Ed. 2d 1062 (1991); *State v. Alston*, 307 N.C. 321, 331, 298 S.E.2d 631, 639 (1983). Whether a party has complied with discovery and what sanctions, if any, should be imposed are questions addressed to the sound discretion of the trial court. *State v. Weeks*, 322 N.C. 152, 171, 367 S.E.2d 895, 906 (1988). "[T]he discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the State in its noncompliance with the discovery requirements." *State v. McClintick*, 315 N.C. 649, 662, 340 S.E.2d 41, 49 (1986). "The choice of which sanctions to apply, if any, rests in the sound discretion of the trial court and is not reviewable absent a showing of an abuse of that discretion." *State v. Gladden*, 315 N.C. 398, 412, 340 S.E.2d 673, 682, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

*Tucker*, 329 N.C. at 716-17, 407 S.E.2d at 809-10; *see also* N.C.G.S. § 15A, Article 48 (1988).

In the instant case, the trial court made the following relevant findings of fact:

(3) The long delay between the analysis and the formal preparation of the report is attributable to a personnel crisis in the SBI laboratory. Indeed, the laboratory has been plagued by an inordinately high turnover of qualified lab personnel. During the period in question, 6 out of 10 experts left the employ of State Bureau of Investigation for better paying jobs. The efficiency of the lab has been seriously hampered by this regrettable situation.

. . . .

(8) There has been no inexcusable delay by the District Attorney in delivering the lab reports in a timely fashion after he received the same. On March 8, 1988, the Court was in recess throughout the entire day, and at the direction of the Assistant District Attorney, agents Leonard, Duncan and Hamlin talked with counsel for the defendant and were interviewed by him with respect to the particulars of the results of their analysis and examination of latent lifts from the crime scene and physical evidence submitted for examination to determine

the presence of latent lifts, if any, and all resulting comparisons therefrom.

. . . .

(10) While this Court cannot put its stamp of approval upon the sequence and timing of the development and transfer of scientific evidence in the case, under the totality of the circumstances, the time lag is understandable and explainable, and the Court can perceive no prejudice that has resulted to the defendant as to his ability to present his defense.

The trial court made the following conclusion of law:

[T]he inordinate delay between the submission of evidence for fingerprint examination and analysis and the delivery of lab reports to the District Attorney does not result from any intentional effort to evade discovery, nor does it result from any deliberate strategy to prevent the defendant from obtaining the results of scientific tests.

We believe that there is ample evidence to support the trial court's findings of fact which in turn support its conclusion of law. We are therefore bound by these findings. *See generally State v. Moore*, 301 N.C. 262, 267, 271 S.E.2d 242, 246 (1980) (trial court's findings of fact are binding upon an appellate court when supported by competent evidence), *overruled on other grounds* by *State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 573-74 (1986).

Agent R.C. Duncan, Assistant Supervisor of the Latent Evidence Section of the S.B.I., testified on *voir dire* that because of a high rate of turnover in personnel, the S.B.I. had been seriously hampered in its ability to perform analyses and generate reports. Agent Duncan testified that in the latter part of 1987, the S.B.I. lost six of its ten examiners, who left primarily for better paying jobs elsewhere. He testified that after the turnover, the S.B.I. was left with between 800 and 1000 cases to divide between the supervisor and three examiners. We find this evidence sufficient to support the trial court's findings that the long time lapses between the submission of the items to the S.B.I. laboratory and the receipt of its analysts' reports resulted from an unavoidable turnover in personnel rather than from any bad faith on the part of the State.

[4] Defendant further contends that the trial court abused its discretion by offering to grant a mistrial rather than dismissing

STATE v. MILLS

[332 N.C. 392 (1992)]

the charges against him for failure of the State to comply with discovery requirements. During the course of the trial, the prosecutor called Agent Spittle, who testified that luminol had been sprayed inside the bathroom cabinet in defendant's trailer where the socks were found, and that a positive reaction resulted. Defendant objected, and outside the jury's presence, informed the trial court that this particular testimony was not contained in Agent Spittle's report. The prosecutor stated that he had not referred to the laboratory report when he briefly discussed the matter with Agent Spittle prior to his testimony, and he had simply forgotten that the bathroom cabinet was not specifically mentioned in the report. At that point, the trial court asked defendant if he wanted a mistrial, and directed defense counsel to discuss the problem privately with defendant. After continued discussion with defense counsel, the trial court concluded that since evidence had already been presented that the socks were found in the cabinet and that they were bloody, the fact that the luminol spray of the cabinet produced a positive reaction was simply corroborative evidence. Defense counsel then stated that he was not moving for a mistrial but was moving instead for dismissal of the charges against defendant. After hearing *voir dire* testimony from Agent Spittle, the trial court declared that it was not going to dismiss the charges since dismissal would be too severe, particularly in view of the preliminary nature of the evidence. The trial court did, however, admonish the prosecutor to screen any further scientific evidence to ensure that what he offered at trial comported with discovery disclosures made to the defense. Defendant now contends that "giving him the choice between a mistrial and continuing the trial was not fair. Rather, the trial [c]ourt should have dismissed the charges." We disagree.

As we said earlier, whether a party has complied with discovery is a question left to the discretion of the trial court. *State v. Weeks*, 322 N.C. at 171, 367 S.E.2d at 906. The choice of which sanction, if any, to apply for violating discovery is also a matter of discretion. *Id.* Discretionary rulings of the trial court will not be disturbed on the issue of failure to make discovery absent a showing of bad faith by the State. *State v. McClintick*, 315 N.C. at 662, 340 S.E.2d at 49. In the instant case, there was competent evidence supporting the trial court's findings and conclusions that the State did not act in bad faith during discovery. Also, the trial court's admonition to the prosecutor and offer of a mistrial to defendant

were proper exercises of discretion supported by sound reasons. For the foregoing reasons, we hold that the trial court did not abuse its discretion by denying defendant's motion to dismiss as a sanction for the State's violation of discovery procedures.

In his third argument, defendant contends that the trial court committed reversible error by excluding relevant evidence which implicated a third party as the perpetrator of the murder. Defendant argues that he should have been allowed to present evidence tending to show that defendant's father, Speedy Mills, the husband of the victim, was the actual perpetrator of the murder. Prior to trial, defendant filed a motion to "be allowed to question James E. [Speedy] Mills about convictions and charges more than ten years old." In the motion, defendant alleged that Speedy Mills had been convicted of killing his first wife and of shooting his second wife. The victim was his third wife. Defendant asserted that these facts constituted evidence of habit or routine practice and were otherwise relevant. The trial court denied the motion to the extent that defense counsel sought to question Speedy Mills about prior *charges* and *indictments* more than ten years old, but granted the motion to the extent that defense counsel sought to question Mills about *convictions* more than ten years old. We find no error.

[5, 6] The general rule regarding evidence of prior charges and indictments is that "[a]ccusations that [a witness] has committed other extrinsic crimes are generally inadmissible even if evidence that [the witness] actually committed the crimes would have been admissible." *State v. Meekins*, 326 N.C. 689, 699, 392 S.E.2d 346, 351 (1990); *see also State v. Williams*, 279 N.C. 663, 185 S.E.2d 174 (1971) (a witness may not be cross-examined as to whether he has been indicted or is under indictment for a criminal offense other than that for which he is on trial). In the instant case, not only did defendant seek to elicit information about prior charges and indictments, he sought this information from his own witness. Under the above-stated principles, this testimony would be generally inadmissible. Even if offered for impeachment purposes, such questioning is prohibited under our rules of evidence. N.C.G.S. § 8C-1, Rule 608, allows impeachment of a witness by inquiries into specific instances of conduct under limited circumstances and only on cross-examination. N.C.G.S. § 8C-1, Rule 608 (1988). Rule 609 allows inquiries into prior convictions under limited circumstances and only during "cross-examination or thereafter." N.C.G.S. § 8C-1,

Rule 609 (1988). Moreover, as Professor Brandis has noted, "it . . . remains true that the calling party is not free on direct examination to impeach his witness by evidence of specific acts or prior convictions." 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 40 (3d ed. 1988). It follows, therefore, that defendant cannot call Speedy Mills as defendant's witness and then attempt to impeach him by inquiring into prior charges or indictments against Speedy Mills. Furthermore, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C.G.S. § 8C-1, Rule 404(b) (1988). Accordingly, evidence that Speedy Mills had committed crimes against his previous wives was inadmissible if its only purpose was to prove his character in order to show that he acted in conformity therewith by killing his third wife.

[7]  Notwithstanding these general principles, defendant contends that the proffered questioning is permissible under this Court's holding in *State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988). In *McElrath*, this Court held, contrary to the trial court's ruling, that a drawing tending to support an alternative theory as to the murderer's identity was admissible, particularly since the State's evidence was totally circumstantial, and since defendant had already presented other admissible evidence tending to support his theory. *McElrath* is distinguishable from the present case in that defendant presented no other evidence tending to support an alternative theory as to the murderer's identity.

Prior to trial, defendant indicated an interest in introducing testimony that on the morning of the murder, Speedy Mills was missing from his place of employment from 12:30 a.m. to 3 a.m., that Mills had taken out a life insurance policy on his wife shortly before her death, and that Mills had shot the victim previously. During trial, after the State rested, the trial court allowed defendant to make a *voir dire* proffer of evidence. Thereafter, the trial court concluded that some of the proffered evidence was probably competent, but declared that the alternative theory of the perpetrator's identity was "in disarray." Defense counsel responded, "Yes, Your Honor." The trial judge said: "Looks at this point like that theory has fallen upon the rocks and shoals. . . ." Defense counsel then announced his desire to go forward. Ultimately, defendant never called any of the witnesses to testify as to the above evidence, even after the trial court had determined that some of the evidence was probably competent. This exchange between the

trial judge and defense counsel, coupled with defendant's decision not to call any of the witnesses presented at the *voir dire* hearing, indicates that defendant opted to forego his theory that Speedy Mills was the perpetrator of the murder. Defendant, rather than the trial judge, was responsible for defendant not introducing the evidence about which defendant now complains. Because defendant presented no evidence tending to support an alternative theory as to the murderer's identity, *McElrath* is not controlling. Accordingly, the trial court did not err in prohibiting defendant from questioning Speedy Mills about prior charges and indictments against· him.·

[8] Defendant's final contention is that the trial court committed reversible error by admitting the alleged murder weapon into evidence. Defendant contends that the reference to the alleged murder weapon, the knife, as belonging to defendant should have been excluded because there was no foundation or basis for this testimony. This contention is completely without merit. Before the victim's son, Leroy Thomas, was shown the knife at trial, he had already testified in detail as to the appearance of defendant's knife prior to the murder and on the day of the murder, and stated that he had even gone so far as to compare the knife with his own. This was sufficient foundation or basis for Thomas to identify the knife as belonging to defendant. *See State v. King*, 287 N.C. 645, 660, 215 S.E.2d 540, 549 (1975) (hammer "similar to" one used to hit victim sufficient identification), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1209 (1976).

In defendant's trial, we find no error.

No error.