STATE OF NORTH CAROLINA v. TAMANCHI LAKEWONDO KRIDER

No. COA99-313

(Filed 16 May 2000)

## 1. Homicide— felony murder—child abuse—motion to dismiss—sufficiency of evidence

The trial court did not err in denying defendant-mothers's motion to dismiss a first-degree murder charge, while committing felonious child abuse with a deadly weapon, because: (1) defendant admitted she shook the child victim and threw him down, and as a result, the child was seriously injured; and (2) the State presented substantial evidence that defendant intentionally assaulted the child on occasions prior to the assault which led to his death, showing the jury could infer defendant intentionally injured him on the day of his death.

## 2. Homicide— deadly weapon—hands

The trial court did not err in denying defendant-mothers's motion to dismiss a first-degree murder charge, while committing felonious child abuse with the use of defendant's hands as a deadly weapon, because: (1) the size of both the actor and the victim are important factors in the determination of whether hands are deadly weapons; and (2) when a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons.

## 3. Homicide— felony murder—child abuse—not ex post facto law

Although defendant argues that her conviction for first-degree murder while committing felonious child abuse with the use of defendant's hands as a deadly weapon should be overturned since the first case establishing felony child abuse as first-degree murder was decided after the victim's death in this case and should be inapplicable due to the prohibition of ex post facto laws, the Court of Appeals has previously noted that hands were treated as deadly weapons well before the date of this offense, and there was nothing to preclude its use for that purpose, nor does this use expand the felony murder statute in any way.

**4. Indigent Defendants— assistance of experts—failure to establish particularized need**

The trial court did not err in a first-degree murder case by denying defendant's motion for the assistance of experts in pathology and dentistry because: (1) defendant failed to establish a particularized need for a forensic pathologist or forensic dentist; and (2) the mere hope or suspicion of the availability of certain evidence that might erode the State's case or support a defense will not satisfy the threshold showing of a specific necessity for expert assistance.

**5. Appeal and Error— preservation of issues—failure to object**

Although defendant contends the trial court erred in a first-degree murder case by admitting the opinion testimony of an oral pathologist who testified that the bite marks on the victim were consistent with defendant's dentition, defendant failed to object to this opinion at trial and has therefore waived review of this issue. N.C. R. App. P. 10(b)(1).

Appeal by defendant from judgment entered 20 May 1998 by Judge Howard E. Manning, Jr. in Rowan County Superior Court. Heard in the Court of Appeals 27 January 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Anne M. Middleton, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for defendant-appellant.*

HUNTER, Judge.

Tamanchi Lakewondo Krider ("defendant") was convicted of first degree murder for causing the death of her two year-old son, DeMallon Krider ("DeMallon"), while committing felony child abuse with the use of her hands as a deadly weapon. Defendant appeals. We find no error.

The State's evidence at trial indicated that defendant was sent to prison in 1994 when she was a twenty-four year-old single mother. At the time, defendant's son DeLondon was one year-old and defendant's mother took custody of him. DeMallon was born while defendant was in prison in December 1994 and the North Carolina Department of

**STATE v. KRIDER**

[138 N.C. App. 37 (2000)]

Social Services ("DSS") awarded custody of him to foster parent Doris Boyd ("Boyd").

Defendant was released from prison in September 1996, and at that time, acquired housing and employment, participated in DeMallon's medical appointments and speech therapy for mild speech delay, and maintained visitation with DeMallon. Defendant remained drug free, participated in narcotics anonymous, and complied with her medical treatment through the county health department. Defendant was eager to regain custody of her children. The facts relevant to the present appeal indicate that DSS worked to help defendant and Boyd develop a permanent plan for DeMallon. With monitoring by DSS, defendant's visits with DeMallon were gradually increased from supervised to unsupervised, then to overnight visits. On 5 May 1997, when DeMallon was just over two years old, defendant was given probationary physical custody of him. On that date, DeMallon had no physical injuries, although tubes had been put in his ears to remedy a hearing problem when he was one and a half years old.

Defendant testified that trouble began on Mother's Day 1997, when Boyd telephoned DeMallon, and DeMallon referred to her as "Mama." Defendant admitted she was jealous, and DeMallon's whining for Boyd hurt defendant's feelings and made her angry. When DeMallon stayed with Boyd on Memorial Day weekend, he did not want to get out of the car when she returned him to the home of defendant.

On or about 31 May 1997, defendant's sister Monica Boyd ("Monica") came from Texas on vacation to help her and defendant's other sister, April Boyd ("April"), with their children. On 1 June, Monica was at April's apartment, which was right across the street from defendant's apartment. Monica heard the children screaming for her to come over there, and when she got to defendant's apartment, she found DeMallon lying unconscious at the bottom of the stairs. Monica called for Emergency Medical Services ("EMS"), which responded and checked DeMallon, concluding that he did not need to be transported to the hospital.

Boyd visited DeMallon on 8 June 1997, and had to sit outside the defendant's apartment "a long time" before defendant came out with DeMallon. When defendant finally came out, she was carrying DeMallon like a newborn baby, a way that Boyd had never seen before. DeMallon was dressed in winter clothes—long dark pants and

a long-sleeved shirt. Defendant stood so close to the car door that Boyd could not open it, and seemed very unhappy with Boyd for being there. Boyd then noticed a "shocking" and "frightening" bruise that ran all the way down the left side of DeMallon's face. Defendant told Boyd that some children had hit DeMallon on the head with a truck. Boyd ' then noticed some scratches on DeMallon's face and hand and as a result became very upset. Defendant seemed uneasy and said "I've told these people they're going to have to quit beating on my baby." Boyd asked if DSS knew about this, and defendant replied that she had taken DeMallon to the doctor.

The next day, 9 June 1997, defendant took DeMallon to the emergency room at Rowan Regional Medical Center. DeMallon was wearing a long-sleeved shirt and had bruises on both cheeks. The doctor on duty asked that a nurse notify DSS of defendant's report that other children had beaten and bitten DeMallon. Defendant stated that she had already reported this to law enforcement, but that nothing had been done about it.

As a result of the report to DSS, social workers went to defendant's apartment the next day, 10 June 1997. DeMallon was drowsy, glassy-eyed, and did not appear to feel well. He had what appeared to them to be two bite marks to the right of his navel and one bite mark below what appeared to be a patch of eczema on his upper back. Defendant told the social workers that the bite marks came from April's one year-old son Tony, and that another boy in the apartment building had scratched DeMallon's face. Since this was consistent with the information given by defendant at the hospital the day before, the social workers believed it was reasonable, and offered to help defendant with supervision problems to prevent future injuries. DSS determined that no abuse had occurred and defendant's probationary physical custody of DeMallon was allowed to continue.

On 15 June 1997, EMS was dispatched to defendant's apartment. Officer Mark Shue of the Salisbury Police Department heard the dispatch on a scanner and reported to the scene. When he arrived, he heard a female screaming upstairs, and proceeded to find defendant, Monica, and several small children in an upstairs bedroom. DeMallon was lying on his back on the floor in a pool of clear liquid combined with orange-colored vomit around his face. The child was unresponsive, with no pulse or respiration. Defendant reported that DeMallon had been this way for ten to fifteen minutes, and Shue began cardiopulmonary resuscitation. DeMallon showed no signs of life and was cool to the touch. Shue noticed bite marks on his chest, bruises

on his face, and a burn in the shape of an iron on his inner forearm. EMS arrived and transported DeMallon to the hospital, where he was declared dead.

Defendant initially reported that DeMallon had woken up, gasped for air, and starting vomiting. Although she told her probation officer she did not give DeMallon mouth-to-mouth resuscitation because she was HIV positive and did not want to give him her disease, she told the Salisbury police that she had attempted mouth-to-mouth resuscitation on DeMallon.

On 17 June 1997, defendant agreed to go with the police and have dental impressions made of her teeth. After the impressions were made, defendant confessed that she hurt DeMallon in the weeks before his death by throwing him around and biting him, and that she shook him and threw him to the floor on the day of his death. On the day of his death, DeMallon had wet himself while taking a nap and defendant asked him what was wrong with him. When DeMallon did not answer, defendant started shaking him and yelling, asking him what was wrong. Defendant first stated that after she shook DeMallon, she threw him to the bed and he fell off and hit the floor. Later, defendant admitted that after shaking DeMallon, she threw him directly to the floor, where he hit his head on the bed frame.

An autopsy was performed on DeMallon which revealed that his cause of death was head trauma resulting from impact to the head. Internal injuries to DeMallon's head may have also been a result of his having been shaken. Expert testimony revealed that DeMallon had two hemorrhages, one of which appeared to be very recent—the brain was markedly swollen, and subdural blood was present around the brain stem. In addition, there were indications of previous subdural hematomas, suggesting prior head trauma at least weeks old. There were multiple hemorrhages into DeMallon's retina, indicating recent head injury, as well as reddish-brown coloration of the optic nerves and chronic inflammation around the optic nerve, which was evidence of prior head injury. At the time of his death, DeMallon was thirty-six inches tall and weighed twenty-six pounds, and had several healing scars and multiple bruises to the face, abdomen, chest, and both arms and legs, all indicative of inflicted injuries. The bite marks on his body were compatible with defendant's arch size and location of her teeth.

Defendant was indicted for first degree murder of DeMallon Krider on 23 June 1997. The case was tried at the 11 May 1998 crimi-

STATE v. KRIDER

[138 N.C. App. 37 (2000)]

nal session of Rowan County Superior Court, where defendant was found guilty of first degree murder and sentenced to life imprisonment. Defendant appeals.

[1] Defendant first assigns error to the trial court's denial of her motion to dismiss, arguing that there was insufficient evidence from which the jury could have reasonably found that she intentionally injured DeMallon or used her hands as deadly weapons.

On a motion to dismiss, the trial court must determine whether there is substantial evidence of each essential element of the offense charged and that the defendant is the person who committed the offense. *State v. Olson*, 330 N.C. 557, 411 S.E.2d 592 (1992). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' ", *State v. Rogers*, 109 N.C. App. 491, 504, 428 S.E.2d 220, 228, *disc. review denied*, 334 N.C. 625, 435 S.E.2d 348 (1993), *cert. denied*, 511 U.S. 1008, 128 L. Ed. 2d 54, *reh'g denied*, 511 U.S. 1102, 128 L. Ed. 2d 495 (1994) (quoting *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980)), but it must do more than merely raise a suspicion of conjecture as to the existence of a necessary element of the charged offense. *State v. Stanley*, 310 N.C. 332, 312 S.E.2d 393 (1984). When testing the sufficiency of evidence in a criminal case, the trial court must find that "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, *reh'g denied*, 444 U.S. 890, 62 L. Ed. 2d 126 (1979) (emphasis in original). In ruling on a motion to dismiss for insufficiency of the evidence, the trial court must consider "all the evidence . . . in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Pierce*, 346 N.C. 471, 491, 488 S.E.2d 576, 588 (1997) (citing *State v. McCullers*, 341 N.C. 19, 28-29, 460 S.E.2d 163, 168 (1995)).

Murder in the first degree is defined as:

A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon . . . .

N.C. Gen. Stat. § 14-17 (1999). In the case *sub judice*, the State pursued the theory that defendant killed DeMallon while committing felonious child abuse with the use of a deadly weapon, the deadly weapon being defendant's hands. We shall first examine whether substantial evidence supported each element of felonious child abuse.

Our statutory code provides:

(a) A parent or any other person providing care to or supervision of a child less than 16 years of age who *intentionally* inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a Class E felony . . . .

N.C. Gen. Stat. § 14-318.4(a) (1999) (emphasis added). It is uncontroverted that defendant was the parent of DeMallon, was providing care to him, and he was under sixteen years of age at the time of his death. Defendant admitted that she shook him and threw him down, and as a result, DeMallon was seriously injured. Therefore, we can conclude that defendant's assault caused DeMallon's injury and the only question remaining is whether defendant intentionally committed the assault.

For the purpose of showing malice, premeditation, deliberation, intent or ill will against the victim, evidence of a defendant's prior assaults on the victim for whose murder the defendant is being tried is admissible at trial under N.C. Gen. Stat. § 8C-1, Rule 404(b) (1999). *State v. Gary*, 348 N.C. 510, 520, 501 S.E.2d 57, 64 (1998). Furthermore, to show intent in child abuse cases, past incidents of mistreatment are admissible. *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991). In order to prove intent in felonious child abuse, the State does not have to show that defendant intended that the injury be serious, only that he intentionally inflicted an injury that proved to be serious. *State v. Campbell*, 316 N.C. 168, 340 S.E.2d 474 (1986). Our review indicates that the State presented substantial evidence that defendant assaulted DeMallon on occasions prior to the assault which led to his death. The statement of defendant which was read into evidence at trial states, in pertinent part:

". . . I woke up around 12:00 P.M. and DeMallon was laying on the bed like something was wrong. I asked DeMallon what was wrong with him, and he did not answer me. I became upset and angry at

DeMallon and grabbed him up and shaking him and yelling, asking DeMallon what was wrong. . . ." "DeMallon would not answer me, and I threw him, I thought, on the bed, but DeMallon hit the floor instead of the bed. After DeMallon hit the floor, I knew I had done something wrong. . . ." ". . . I had gotten angry at DeMallon before and threw DeMallon around. I have also gotten angry at DeMallon and would bite DeMallon on his cheeks and body, but I never thought I bit him that hard. I didn't mean to kill DeMallon. I would get so angry that DeMallon was scared of me. I tried to tell the people at Social Services, my probation officer, and my mother that they needed to take DeMallon away from me because I would get so angry and seemed like I always took it out on DeMallon. . . ."

Due to substantial evidence that defendant had committed abuse in the past, which was intentional, the jury could infer that she intentionally injured him on the day of his death. Substantial evidence also indicated that while defendant may not have intended to cause serious injury to DeMallon, she shook him and threw him to the floor, causing serious injury. Therefore, under *State v. Campbell*, we hold that substantial evidence supported the intent element of defendant's charge of felonious child abuse. Thus, the only question remaining as to dismissal of the charge of first degree murder is whether or not defendant's hands constituted "deadly weapons."

[2] The size of both the actor and his victim are important factors in the determination of whether or not hands are deadly weapons. In *State v. Jacobs*, 61 N.C. App. 610, 301 S.E.2d 429, *disc. review denied*, 309 N.C. 463, 307 S.E.2d 368 (1983), this Court held that a defendant's fists could have been deadly weapons when:

The defendant, a thirty-nine year old male who weighed two hundred ten pounds, hit the victim, a sixty year old woman, in the head and stomach. Brain hemorrhages and other injuries resulted from the beating, causing the victim to be unable to care for herself. The defendant's fists could have been a deadly weapon given the manner in which they were used and the relative size and condition of the parties.

*Id.* at 611, 301 S.E.2d at 430. This Court also held that defendant's fists could be considered deadly weapons when defendant weighed approximately one hundred seventy five pounds and his victim weighed approximately one hundred seven pounds, and he beat her about the head with his fists, breaking her jaw, and choked her three

separate times leaving marks around her neck that appeared to be "just like fingerprints." *State v. Grumbles*, 104 N.C. App. 766, 769-70, 411 S.E.2d 407, 409-10 (1991). In the case at bar, it is uncontroverted that defendant was an adult, and presumably was much larger in stature than DeMallon, who was thirty-six inches tall and only weighed twenty-six pounds at the time of his death. Furthermore, defendant described the child as "sickly."

In a more recent case, *State v. Pierce*, 346 N.C. 471, 488 S.E.2d 576, our Supreme Court held that the trial court did not err by refusing to grant defendant's motion to dismiss the felony murder charge when the State presented evidence that defendant shook the child victim and caused her death:

> When a strong or mature person makes an attack by hands alone upon a small child, the jury may infer that the hands were used as deadly weapons. *Cf. Elliott*, 344 N.C. at 268-69, 475 S.E.2d at 213 (stating that malice may be inferred from the willful blow by an adult on the head of an infant); *State v. Lang*, 309 N.C. 512, 527, 308 S.E.2d 317, 325 (1983) (stating that the trial court could have instructed the jury that it could infer malice if it found "that the defendant intentionally assaulted the deceased with his hands, fists, or feet, *which were then used as deadly weapons*"). Defendant is an adult male who weighed approximately 150 pounds at the time of his arrest. The evidence that he caused a small child's death by shaking her with his hands was sufficient to permit the jury to conclude that defendant committed felonious child abuse and that he used his hands as deadly weapons. Thus, the trial court did not err by refusing to grant defendant's motion to dismiss the charge of first-degree murder under the felony murder rule.

*State v. Pierce*, 346 N.C. at 493, 488 S.E.2d at 589 (emphasis in original). Similarly, in the present case, defendant, an adult female, admitted not only shaking DeMallon, but also throwing him to the floor.

[3] Defendant argues that *State v. Pierce* was the first case establishing felony child abuse as first degree murder, and because it was decided on 24 July 1997, after DeMallon's death, it has no applicability to this case due to the prohibition of *ex post facto* laws. In regard to this issue, this Court has stated:

> Both the North Carolina and United States Constitutions forbid the enactment of *ex post facto* laws. U.S. Const. art. I, § 10;

N.C. Const. art. I, § 16. From the beginning of American jurisprudence, the United States Supreme Court has defined an *ex post facto* law to be a law that "(1) makes an action criminal which was done before the passing of the law and which was innocent when done, (2) aggravates a crime or makes it greater than when it was committed, (3) allows imposition of a different or greater punishment than was permitted when the crime was committed, or (4) alters the legal rules of evidence to permit different or less testimony to convict the offender than was required at the time the offense was committed." *State v. Vance*, 328 N.C. 613, 620, 403 S.E.2d 495, 500 (1991). *See also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L. Ed. 648, 650 (1798). In other words, in order for a criminal law to be an *ex post facto* violation, it must be both retrospective by applying to events which occurred " 'before its enactment, and it must disadvantage the offender affected by it.' " *Id*. (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 67 L. Ed. 2d 17, 23 (1981)).

Although *ex post facto* laws have traditionally been directed specifically at legislative actions, the United States Supreme Court has held that the Fifth and Fourteenth Amendments to the U.S. Constitution "forbid retroactive application of an unforeseeable judicial modification of criminal law, to the disadvantage of the defendant." *Id*. In this case, however, there is no judicial modification of any criminal law. The felony murder rule has existed in its present form since 1977 and automobiles were treated as deadly weapons well before the date of the offense in this case. Although a felony perpetrated by an automobile has apparently not been used to support a felony murder conviction in the past, there is nothing to preclude its use for that purpose, nor does it expand the statute in any manner. . . .

*State v. Jones*, 133 N.C. App. 448, 456-57, 516 S.E.2d 405, 411, *review on additional issues allowed*, 351 N.C. 189, —— S.E.2d —— (1999). Similarly, we have noted that hands were treated as deadly weapons well before the date of the offense in this case. *State v. Grumbles*, 104 N.C. App. 766, 770-71, 411 S.E.2d 407, 410; *State v. Jacobs*, 61 N.C. App. 610, 301 S.E.2d 429. Likewise, we hold that while at the time of DeMallon's death felony child abuse had not been used to support a first degree murder conviction due to the use of the hands as deadly weapons, there was nothing to preclude its use for that purpose, nor does this use expand the felony murder statute in any way. Under the laws of this state, a defendant may be convicted of first degree mur-

der despite the lack of premeditation or deliberation if she attempted to or committed a felony with the use of a deadly weapon, causing the victim's death. *See* N.C. Gen. Stat. § 14-17 (1999). Accordingly, this assignment of error is overruled.

**[4]** Next, defendant contends that the trial court erred in denying her motion for the assistance of experts in pathology and dentistry.

Our Supreme Court has held:

> An indigent defendant is entitled to the assistance of an expert in preparation of his defense when he makes a "particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case." *State v. Parks*, 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992). "The particularized showing demanded by our cases is a flexible one and must be determined on a case-by-case basis." *Id.* at 656-57, 417 S.E.2d at 471. "The determination of whether a defendant has made an adequate showing of particularized need lies within the trial court's discretion." *State v. Rose*, 339 N.C. 172, 187, 451 S.E.2d 211, 219 (1994), *cert. denied*, [515] U.S. [1135], 132 L. Ed. 2d 818 (1995).

*State v. McCullers*, 341 N.C. 19, 34, 460 S.E.2d 163, 172. Our review indicates that defendant failed to establish a particularized need for a forensic pathologist or forensic dentist in her motion before the trial court. The motion merely reflects defendant's wish that a pathologist might assist in developing evidence to erode the State's case. The mere hope or suspicion of the availability of certain evidence that might erode the State's case or buttress a defense will not suffice to satisfy the requirement that defendant demonstrate a threshold showing of a specific necessity for expert assistance. *State v. Pierce*, 346 N.C. 471, 484, 488 S.E.2d 576, 583.

In *Pierce*, the defendant made a motion for a pathologist, which was denied, wherein he contended that such an expert could assist him in determining how the victim's injuries were inflicted. The Court noted that two doctors testified that the child was a victim of the battered-child syndrome and the shaken-baby syndrome, and all the evidence at trial suggested that her death was caused by the injuries to her brain and that these injuries were incurred as a result of child abuse. Also, "[d]efendant's pretrial statements that [the child] had been attacked by the family dog and assaulted by other children in the neighborhood and that she bruised easily were overwhelmingly

refuted by the evidence presented by the State." *Id*. at 484, 460 S.E.2d at 584. The Court in *Pierce* held that defendant's assertions that the requested expert assistance would be beneficial or even essential to the preparing of an adequate defense, were undeveloped and were insufficient to satisfy the threshold requirement of specific necessity. *Id*. Similarly, defendant here presented an undeveloped assertion in her motion for expert assistance that DeMallon's bruises may have been a rash, but this assertion was refuted by other evidence, including defendant's confession. Defendant has failed to show how she was denied a fair trial by denial of this motion, and accordingly, we find no error in the trial court's denial.

**[5]** Next, defendant contends the trial court erred in admitting the opinion testimony of oral pathologist Dr. Ernest Burkes, who testified that the bite marks on DeMallon were "consistent with" defendant's dentition. Our review of the transcript reveals that defendant failed to object to this opinion at trial and has therefore waived this issue on appeal. N.C.R. App. P. 10(b)(1). Accordingly, this assignment of error is dismissed.

No error.

Judges JOHN and McGEE concur.